KENNECOTT COPPER CORPORATION, NEVADA MINES DIVISION, McGILL, NEVADA, Plaintiff,

v.

Russell E. TRAIN, Administrator, Environmental Protection Agency, Defendant.

Civ. No. LV 76–195 RDF.

United States District Court, D. Nevada.

Nov. 24, 1976.

C., Clarence E. Horton, Ely, Nev., for plaintiff.

U. S. Atty. Lawrence J. Semenza, Las Vegas, Nev., John E. Varnum, Dept. of Justice, Washington, D. C., for defendant.

Atty. Gen. Robert List, Carson City, Nev., amicus curiae.

## OPINION

ROGER D. FOLEY, Chief Judge.

On October 12, 1976, plaintiff Kennecott Copper Corporation filed a complaint and motion for a preliminary injunction against Administrator Russell E. Train of the Environmental Protection Agency (EPA) seeking declaratory and injunctive relief. Kennecott seeks a determination that a variance and revision of the current Nevada State Implementation Plan (SIP or NIP) for Kennecott's copper smelter located in McGill, Nevada, granted after notice and hearing on October 7, 1976, by the Nevada Environmental Commission, meet all the requirements of Section 110(a)(2) of the Clean Air Act, 42 U.S.C. § 1857c–5(a)(2), and that the NIP, as revised, must be approved by the Administrator for the EPA.[1] Kennecott requests the Court to require the Administrator to approve the variance and revision of the Nevada implementation plan and to enjoin him from enforcing the current Nevada implementation plan against Kennecott. Kennecott closed its McGill smelter on July 31, 1976, after the EPA insisted that civil and criminal sanctions would be imposed unless Kennecott complied with the current NIP. Kennecott contends that it could not comply because the current Nevada plan required the installa-

Jon R. Collins, of Lionel, Sawyer & Collins, Las Vegas, Nev., Prather, Seeger, Doolittle, Farmer & Ewing, Washington, D.

1. Counsel for the parties in this case treat the variance granted and the revision of the Nevada implementation plan to include the variance as two separate and distinct procedures. This Court questions that position in view of the following language of Mr. Justice Marshall in *Union Electric Co. v. EPA,* 427 U.S. 246 at p. 266, 96 S.Ct. 2518 at p. 2529, 49 L.Ed.2d 474 at p. 488:

   "Perhaps the most important forum for consideration of claims of economic and technological infeasibility is before the state agency formulating the implementation plan. So long as the national standards are met, the State may select whatever mix of control devices it desires, *Train v. NRDC,* 421 U.S. [60] at 79, 95 S.Ct. [1470] at 1481, [43 L.Ed.2d 731], and industries with particular economic or technological problems may seek special treatment in the plan itself. Cf. 40 CFR §§ 51.2(b), (d) (1975), S.Rep.No.91–1196, 91st Cong. 2d Sess., 36 (1970). Moreover, if the industry is not exempted from, or accommodated by, the original plan, it may obtain a variance, as petitioner did in this case; and the variance, if granted after notice and a hearing, may be submitted to the EPA as a revision of the plan."

tion of a constant control system (an acid plant) which was economically infeasible. Kennecott desires to resume the operation of its McGill copper smelter and has assured this Court that it will do so if the preliminary injunction sought is granted, compelling the approval by the EPA of the variance and revision of the Nevada plan adopted by the Nevada Commission on October 7, 1976. On October 22, 1976, the defendant Administrator filed a motion to dismiss. On October 29, 1976, the State of Nevada filed an amicus curiae brief supporting Kennecott's position in this suit. On November 4, 1976, this Court heard the motions for preliminary injunction and to dismiss.

At the outset, Kennecott is faced with a two-pronged challenge to its effort to secure injunctive relief. The Administrator asserts, in his motion to dismiss and in opposition to Kennecott's motion for preliminary injunction, that: (1) this Court lacks jurisdiction to entertain the suit, and that the complaint fails to state a claim for relief, and (2) Kennecott cannot satisfy the first requirement necessary for obtaining injunctive relief, namely, a demonstration that Kennecott will likely prevail on the merits. To better understand plaintiff's claim, it is helpful to summarize the pertinent parts of the Clean Air Amendments of 1970. A comprehensive history of the amendments and their implementation appear in Mr. Justice Rehnquist's opinion for the Supreme Court in *Train v. NRDC*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

The Clean Air Act Amendments of 1970 marked a significant step in a national effort to control air pollution. Previous legislation had left the primary responsibility for establishing and enforcing air quality standards to the states, with the federal government assuming the limited role of assisting the states with research and technical guidance. Disappointed with the response of the states, who were besieged by technical and economic problems in at-

tempting to clean up the air, "Congress reacted by taking a stick to the States in the form of the Clean Air Amendments of 1970." (*Train v. NRDC*, 421 U.S. at p. 64, 95 S.Ct. at 1474.) The amendments of 1970 were designed to correct the slow progress made in controlling air pollution since the enactment of the 1967 Air Quality Act.

The 1967 act had authorized the states to develop their own air quality standards and emission limitations for achieving those standards.[2] It directed the Secretary of Health, Education and Welfare to issue information on recommended air pollution control techniques. These recommendations were required to include data on the latest available technology and economic feasibility of alternative methods of prevention and control of air contamination including cost effectiveness analysis. The approval of the Secretary of HEW was contingent on the standards being consistent with these recommended control criteria. If they were not consistent, the Secretary was authorized to issue standards consistent with the criteria. The legislation permitted numerous interruptions through hearings and notice time periods which severely limited the effectiveness of the states or the Secretary in establishing standards. Even when the standards were finally implemented, they reflected an emphasis on the economic and technological feasibility of achieving the standards. Further indication of the reliance placed on these two factors in the 1967 act is found in the enforcement section which directed the Court to give due consideration to the practicability and to the technological and economic feasibility of complying with such standards. These sections, providing for the establishment and enforcement of air quality standards, were drastically changed by the 1970 amendments.

The 1970 act enlarged the federal role in combatting air pollution by providing for EPA promulgation of air quality criteria and national ambient air quality standards.

2. In general, air quality standards would establish the quantity of air pollutants that would be tolerated. Emission limitations are the meth-

odology or technology of reducing the quantity of air pollutants and thus improving the air quality.

(42 U.S.C. § 1857c–4.)[3] The EPA Administrator was directed to promulgate national primary and secondary ambient air quality standards for all air pollutants having an adverse effect on the public health or welfare.[4] In basing the primary standards on what is necessary to protect the public health, and placing strict time limits for attainment of this level of air quality, Congress arguably intended to place secondary emphasis on economic and technological feasibility in the establishment and implementation of air quality standards. This marked a shift from the 1967 act wherein, as previously noted, economic and technological feasibility played a significant role.

Controversy has arisen, therefore, under the 1970 amendments regarding the relevance of economic and technological feasibility considerations in state implementation plans. 42 U.S.C. § 1857c–5(a)(1) (1970) instructs states to adopt, after public hearings, a plan providing for the attainment, maintenance and enforcement of the national primary and secondary air quality standards. The Administrator then reviews (see 42 U.S.C. § 1857c–5(a)(2)) the state plans to assure that they meet the requirements established by 42 U.S.C. § 1857c–5.[5] Significantly, there is no mention of economic or technological feasibility in subparagraphs A through H of § 1857c–5(a)(2). This omission has contributed confusion regarding the proper place of economic and technological feasibility factors in state implementation plans, which in turn has resulted in considerable litigation, including the instant case.

On January 1, 1972, the Governor of Nevada submitted the original state implementation plan to the Administrator of the EPA. Pursuant to the Clean Air Act, the Administrator had until May 31, 1972, to either approve or disapprove the Nevada plan. If the Administrator chose to disapprove the state plan, he had six months after the plan had been submitted to promulgate new regulations. The original Nevada plan called for the installation of an acid plant, as well as the employment of supplemental control systems.[6] Kennecott's

---

**3.** Ambient air is defined by statute to mean all outdoor air used by the general public.

**4.** The national ambient air quality standards establish the maximum permissible concentrations in the atmosphere of each pollutant identified as dangerous to the public health or welfare. (42 U.S.C. § 1857c–4 (1970)). National ambient air standards, both primary and secondary, are established on the basis of particularized air quality criteria. These criteria are established for each air pollutant which, in the Administrator's judgment, "has an adverse effect on public health and welfare, [and] . . . the presence of which in the ambient air results from numerous or diverse mobile or secondary sources . . . .." (42 U.S.C. § 1857c–3(a)(1)(A)–(B)). The primary standard for each pollutant must reflect the maximum levels which would not endanger the public health.

Thus, while federal primary air standards relate directly to man's physiological health, federal secondary standards relate directly to man's environment.

**5.** The basic requirements are that the plans guarantee (1) the attainment of the national primary standards "as expeditiously as practicable," but in no case later than three years after the date of the approval of the plan, and (2) the attainment of the secondary standards within a "reasonable time" to be specified by each plan. Each plan must include "emission limitations schedules, timetables for compliance with limitations, and such other measures as may be necessary to insure attainment and maintenance" of the national standards.

If the Administrator finds that a plan meets all of the statutory conditions, he must approve the plan within four months of the date of its submission. If, on the other hand, he finds a plan or any portion of a plan does not satisfy any of the statutory conditions, he must disapprove that plan or portion. He is then directed to prepare and publish "promptly" his own substitute regulations within six months after date of submission.

**6.** It is helpful in addressing the issues in this case to explain the different terms used to define the types of controls employed to effect attainment of ambient air standards. "Constant control systems" (the proposed acid plant) are control methods which effect a reduction in the total amount of pollutants emitted into the atmosphere, usually through a specific quantitative limitation or reduction on the amount any given source may emit. "Supplemental control systems" in this case are two, "intermittent control systems" (limiting production and hence reducing emissions) and "dispersion enhancement techniques" (tall stacks). Constant control techniques differ from the tall stack dispersion methods in that the latter merely spread the pollutant over a

proposed plan met with the approval of the Nevada Commission. On May 31, 1972, the EPA approved the Nevada plan insofar as the primary standards concerning sulphur dioxide ($SO_2$) emissions were concerned. At the same time, the EPA decided to defer approval of the Nevada plan concerning secondary standards in relation to $SO_2$ emissions at the McGill operations.[7] On August 31, 1972, Kennecott met with the EPA in Carson City, Nevada, to discuss the proposed construction of an acid plant.[8] It was at this meeting that Kennecott expressed its concern over EPA's deferral of decision on the subject, the secondary standards in relation to the $SO_2$ emissions.[9] The Nevada Commission submitted an amended plan. (39 Fed.Reg. 38104–05 (Oct. 29, 1974)). The EPA rejected the state's amendments and proposed one of its own. On February 6, 1975, EPA finally adopted a plan of its own.

(40 Fed.Reg. 5515 (Feb. 6, 1975)). The amended Nevada plan, which was rejected, provided for a 60% reduction of $SO_2$ emissions from the McGill smelter by installation of an acid plant to convert $SO_2$ to sulfuric acid. In addition, when the weather conditions were so adverse that the 60% reduction in emissions resulting from operation of the acid plant would not be sufficient to maintain the national air quality standards, the Nevada plan provided for reducing the level of production at the smelter. The EPA rejected the Nevada plan on the ground that an 86% reduction of $SO_2$ emissions from the McGill smelter was required to achieve the air quality standards. However, in the plan adopted by the EPA, it was recognized that an 86% reduction was not feasible.[10] The EPA plan therefore provided that, as an interim measure, Kennecott might use continuous

broader area without reducing the concentration of the pollutants at its source or reducing the overall amount of pollutants emitted. An "intermittent control system" monitors the ambient air around the copper smelter. If pollutant levels are measured which violate the national ambient air quality standards, the smelter operation would be reduced to limit the emission of more pollutants into the air.

7. While the Clean Air Act mandated the Administrator to set the national primary standards "as expeditiously as practicable," the attainment of the secondary standards, by contrast, was only within a "reasonable time." Apparently, the EPA was not satisfied at the time the Nevada plan was before it, that it had enough data on dispersion techniques to make a ruling.

8. The proposed acid plant is a type of constant control technique that would limit the amount of pollutant emissions at the source. It would take the $SO_2$ emissions and convert them into sulfuric acid.

9. Kennecott then stated it had no objection to the proposed construction of an acid plant at a cost of roughly 23 million dollars. However, Kennecott stated it was concerned with the marginal profitability of the McGill operation and that while the present financial picture barely justified the expenditure, any additional expenditure would not be warranted. Kennecott did not want to risk the loss of 23 million dollars, if the possibility still existed that further substantial expenditures would be required. Therefore, Kennecott pressed the EPA

for a decision concerning the secondary standards.

10. The Kennecott operation primarily consists of a "reverberatory" furnace employed in the primary stage of smelting, and a "convertor" used in a followup stage. A reverberatory furnace is a large oven that heats the ore, resulting in a separation of the metal content with a waste product called "slag." This metal, which comes out of the reverberatory furnace, still quite unrefined, is in turn sent to a convertor for further refinement. It is these two mechanisms which are and have been the subject of the continuing controversy between the EPA and Kennecott.

The controversy concerns the limitations of SO2 emissions from these two devices. The reverberatory furnace gives off a "weak" SO2 gas, whereas the convertor gives off a "strong" SO2 gas. The 86% SO2 limitation requirement applied to the emissions is the aggregate of both the reverberatory furnace and the convertor. The installation of the acid plant would be effective to reduce the strong gas emitted by the convertor by 95%. However, it was recognized that the acid plant would be ineffective to treat the weak gas emitted from the reverberatory furnace. Apparently, only by scrapping the reverberatory furnace in favor of some more modern technique, like an electric furnace, could the 86% requirement be met. This is apparently the reason for the reduction from the 86% requirement to the 60% requirement, because it was infeasible to require Kennecott to construct a whole new system to replace the reverberatory furnace.

emission reduction technology capable of reducing emissions by 60%, together with such other supplemental control systems, namely, the use of intermittent controls and a tall stack, as might be needed to maintain national air quality standards.[11] In addition, EPA's plan also provided that, until full compliance with national air quality standards is achieved by means of continuous emission reduction controls alone,[12] Kennecott must undertake a research program to improve continuous emission control technology,[13] and must adopt such improved technology as it becomes available for use at the McGill smelter on an economically feasible basis. However, the interim measure also provided for the suspension of the use of the supplementary control systems and a return to the requirement of constant control systems alone at the discretion of the Administrator. Kennecott took issue with the section of the interim measure which would possibly require Kennecott to install additional constant emission control systems, when it felt that supplemental control systems were adequate to meet the requirements of the Clean Air Act. It was in this vein that Kennecott instituted litigation in the Ninth Circuit Court of Appeals in *Kennecott v. Train*, 526 F.2d 1149 (1975). The Court upheld the EPA's interpretation concerning the requirement of constant emission control systems, but appears to have also held that the same should not be required when economically infeasible.

Thereafter, Kennecott, then operating the McGill smelter at a substantial loss and facing fines of up to $25,000 a day, as well as criminal prosecution of its officers, decided to close down the McGill smelter on July 31, 1976. Kennecott then requested the Nevada Commission to grant a variance for one year only, revising the current implementation plan on the grounds of economic infeasibility to eliminate temporarily the requirement of constant emission control equipment (the acid plant) and permit it to operate using only supplemental control systems.[14] On October 7, 1976, the Nevada Commission granted for one year only Kennecott's request for a variance on the grounds of economic infeasibility and amended its plan accordingly and submitted the same to the EPA for approval. On October 12, 1976, Kennecott filed this suit against the Administrator, alleging that the Administrator has not fulfilled a nondiscretionary duty to approve the revised implementation plan. Kennecott argues that the case law supports its contention that the EPA approval of the Nevada variance is nondiscretionary because the Supreme Court has stated that each state should be given wide discretion in formulating its plan, and the Act provides that the Administrator "shall approve" the proposed plan if it has been adopted after public notice and hearing and if it meets the eight specified criteria of the 1970 amendments (42 U.S.C. § 1857c–5(a)(2) A–H incl.). In addition, Kennecott suggests to this Court that the Ninth Circuit Court of Appeals has held that the employment of constant emission control devices cannot be required when economically infeasible. Kennecott further contends that it is well settled by the Supreme Court that primacy must be given to the state determinations of economic infeasibility.

Based upon the evidence before it and the September 23, 1976, and October 1, 1976, hearings conducted according to law, and after proper notice, the Nevada Commission allowed the variance dispensing Kennecott for one year from the requirement of in-

---

**11.** 40 CFR § 52.1475(e)(7); 40 Fed.Reg. 5515 (Feb. 6, 1975).

**12.** 40 CFR § 52.1475(e)(15); 40 Fed.Reg. 5517 (Feb. 6, 1975).

**13.** 40 CFR § 52.1475(e)(13) and (15)(i)(b); 40 Fed.Reg. 5516 and 5517 (Feb. 6, 1975).

**14.** At the time Kennecott shut down its McGill smelter, the economic picture had changed for the worse. The operation, formerly just marginal, now showed a substantial loss, copper prices had fallen appreciably, and inflation and other factors had boosted the cost of the acid plant from 23 million dollars to 40 million.

stalling the acid plant. The Nevada Commission found that EPA's national ambient air quality standards had theretofore been maintained by Kennecott at McGill at all times pertinent to the 1970 Clean Air Amendments requirements, and further found that Kennecott would continue to maintain the same after operations resumed for the variance period of one year, without the employment of the constant control system (the acid plant), by the use of the supplemental control systems alone, that is, the tall stack dispersal system and intermittent production control system. Further, it has been admitted by EPA in this case, and was admitted during oral argument, that Kennecott has at all times herein pertinent operated the smelter so as to meet EPA's national ambient air quality standards. The issue here is not that under the variance Kennecott will not meet national air quality standards; EPA concedes that. But the issue here is that EPA contends that the 1970 Clean Air Amendments, as construed by the Fifth, Sixth and Ninth Circuit Courts of Appeals (as discussed infra), mandate that as a minimum Kennecott must employ a constant control system, that even though national air quality standards will be met under the variance, EPA cannot lawfully approve same, absent a constant control system.

Kennecott argues here that since the Nevada Commission has already determined that it is economically infeasible at the present time for Kennecott to install an acid plant, this Court must grant Kennecott's motion for a preliminary injunction in order to judicially compel EPA to provide the relief afforded to Kennecott by the State of Nevada when the State Commission granted the variance and revision to the Nevada plan.

Kennecott asserts that the Court has jurisdiction under several statutes: Section 304(a)(2) of the Clean Air Act, 42 U.S.C. § 1857h–2(a)(2); the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; the Mandamus Act, 28 U.S.C. § 1361; and federal question jurisdiction, 28 U.S.C. § 1331. In its motion to dismiss, the EPA contends that this Court lacks jurisdiction over the subject matter of plaintiff's claim and that plaintiff's complaint fails to state a claim upon which relief can be granted.

The EPA states that the first two jurisdictional bases fail because the suit is premature, the required notice has not been given, and Kennecott is in the wrong forum in its request for a court-ordered approval by EPA of the revision of the Nevada implementation plan. Further, the EPA states, the latter two bases fail because the doctrine of sovereign immunity bars unconsented suits against an agency of the federal government.

This Court finds that it has jurisdiction under Section 304(a)(2) of the Clean Air Act, 42 U.S.C. § 1857h–2(a)(2), and that the complaint does state a claim upon which relief can be granted.

While this Court also has jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and under Title 28 U.S.C. § 1331 (the federal question certainly is substantial and the jurisdictional amount is satisfied), and probably has jurisdiction under the Mandamus Act, 28 U.S.C. § 1361, this Court believes it should, and does, rely primarily on the Clean Air Act for jurisdiction in this case.

Section 304(a)(2) is a jurisdictional provision empowering any interested person to sue the Administrator for failure to perform a nondiscretionary duty under the Act. Suits under this provision must be brought in a federal district court, but the amount in controversy and diversity of citizenship requirements do not apply. In addition, plaintiffs should notify the EPA 60 days before they commence an action under Section 304, so that the Administrator may remedy the failure and thereby avoid unnecessary litigation. The pertinent parts of Section 304 are:

"(a) Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf—

"... 

"(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or

duty under this chapter which is not discretionary with the Administrator. The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, . . . to order the Administrator to perform such act or duty, . . .

"(b) No action may be commenced—

" . . .

" . . .

"(2) under subsection (a)(2) of this section prior to 60 days after the plaintiff has given notice of such action to the Administrator, . . . ."

(42 U.S.C. § 1857h–2)

This Court now addresses the challenge made by the EPA that the suit in this court is premature and that adequate notice has not been given to the EPA. Defendant EPA asserts that this suit is premature and not ripe for decision. It is well recognized that the ripeness doctrine involves a twofold aspect, requiring evaluation of both (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

The issue presented for decision ·in the instant litigation is whether the use of constant emission control techniques is necessarily mandated under the Clean Air Act. It is difficult to imagine an issue any more well defined. Not only has the defendant taken a position on the critical issue, but it has stated that because of its interpretation of the law the variance and revision of the Nevada plan cannot be approved.[15] The EPA asserts that the letter should not be interpreted as agency policy. However, the pronouncements are not merely the opinion of a subordinate official but, rather, are the statements of the head of the agency and his attorney. Nor are they informal statements. They were made in an official capacity, one in response to a formal inquiry, another as a statement of fact in this court. As such, they are ripe for review. *National*

*Student Association v. Hershey*, 134 U.S. App.D.C. 56, 412 F.2d 1103 (1969).

The second criterion which the Supreme Court considered in *Abbott Laboratories*, supra, was whether withholding judicial review would entail hardship upon either party. It is uncontroverted here that plaintiff is suffering harm by its inability to operate, and that the harm is compounded with each day's delay. The Court, in *Abbott Laboratories*, supra, found controlling the fact that the announced policy would require "an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." 387 U.S. at 153, 87 S.Ct. at 1518. That is the case here. If the EPA's announced policy is put into effect here, Kennecott's facilities will have to remain closed or it will have to expend a substantial amount of money. This, quite clearly, is a significant change in the conduct of the plaintiff's affairs. Furthermore, should Kennecott operate in violation of the agency directive, it would be subject to a fine of $25,000 a day and subject its officers to criminal prosecution. Therefore, the issue is ripe for adjudication by this Court.

The EPA contends that Kennecott has not given the Administrator any notice of Kennecott's intent to sue to compel the Administrator to approve the variance and revision of the implementation plan adopted by the State of Nevada on October 7, 1976. EPA asserts that since the 60-day notice requirement of Section 304(b) has not been strictly met, the complaint must be dismissed because the Court lacks jurisdiction to entertain an action under Section 304(a). This·Court rejects any suggestion that the 60-day notice requirement of Section 304(b) is jurisdictional. *Friends of the Earth v. Carey*, 535 F.2d 165 (2d Cir. 1976). However, even if the notice requirement was jurisdictional, this Court is satisfied that it has been met. As previously noted, the purpose behind the 60-day notice require-

---

**15.** See letter from Train to Milliken, dated August 16, 1976, attached to plaintiff's complaint as Exhibit "C", attachment 2.

ment is to make the Administrator aware of an alleged failure to carry out a nondiscretionary duty on his part so as to allow him to remedy the failure and thereby avoid unnecessary litigation. As early as May 26, 1976, Kennecott officials, State of Nevada officials, and EPA officials met in San Francisco to discuss the future of the McGill smelter. At that time Kennecott presented EPA a memorandum entitled "Legal Basis for Operating Kennecott's Nevada Smelter without Constant Emission Controls," which began as follows:

"This legal analysis is based on the following factual assumptions:

"(1) The Nevada smelter can meet the national ambient air quality standards by use of SCS alone.

"(2) Installation of constant emission controls is economically infeasible for the Nevada smelter at the present time, and requiring their installation would close the smelter.

"(3) At some future time, installation of constant emission controls may become feasible, if the smelter can be kept operating until its economic circumstances improve.

"(4) Closing the smelter would be economically and socially disastrous for the Ely/McGill area, and would cause great public hardship.

"(5) The State of Nevada is willing to cooperate in taking regulatory steps needed to keep the smelter open, including relaxation of emission limitations, so long as Kennecott meets the ambient air standards and keeps the State informed of its economic situation.

"(6) Kennecott hopes for economic improvement and wishes to keep the smelter open, but cannot guarantee that this will prove possible.

"Given the foregoing factual assumptions, it is concluded that the EPA could approve a plan to keep the smelter open. If the State were to grant Kennecott a variance (or amend the state regulation governing smelter emissions) to permit postponement of compliance with emission limitations due to economic infeasibility, EPA approval would at least be justified and perhaps be required under the law." [16]

Following this meeting, on June 25, 1976, EPA advised Kennecott the course suggested by the foregoing memorandum was unlawful because the smelter could not be operated without the acid plant.[17] Kennecott telegraphed its disagreement with this conclusion to EPA on July 6 and filed a petition for reconsideration on July 15, but the EPA rejected both and on July 20 ordered Kennecott to submit by August 1, 1976, a timetable and plan for constructing an acid plant or face appropriate further enforcement action because "the McGill smelter continues to operate in violation of the Clean Air Act and applicable regulations." [18] On July 28, 1976, Kennecott advised the EPA that it was closing the smelter to avoid criminal prosecution and civil penalties and met in Washington, D.C., with the EPA Administrator himself to renew its request that the EPA allow Kennecott to operate without an acid plant. The EPA was again provided the previously quoted memorandum on the "Legal Basis for Operating Kennecott's Nevada Smelter without Constant Emission Controls." On August 16, 1976, the Administrator responded as follows:

"At the meeting, you raised the question of whether EPA would endorse a SIP revision that would permit the smelter to operate with no constant control technology. To respond to your question we have made an intensive further review of the alternatives which are available to Kennecott in light of the Clean Air Act's

---

16. The complete memorandum is contained in the record as Exhibit "C", Attachment 2, Appendix B. The record copy is one used in a meeting with EPA subsequent to issuance of the Supreme Court's opinion in *Union Electric v. EPA*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976), and was amended to include reference to that case. In all other respects the memorandum was identical to the one used at the May 26 meeting.

17. Exhibit "C", Attachment 2, Appendix A.

18. Exhibit "C", Attachment 2, Appendix C.

expressed preference for constant controls of dispersion technology. We have reviewed the Clean Air Act and particularly the cases in the Fifth, Sixth and Ninth Circuits which deal with the question of the use of dispersion technology and have concluded that, while a number of options remain legally available to Kennecott, EPA would not legally approve a plan revision not requiring the use of constant control technology.

"As you know, every court to address the dispersion technology vs. constant control technology issue has affirmed the intent of the Clean Air Act that ambient standards be achieved by constant controls. By contrast, what you requested would amount to attainment of the standards through dispersion technology only. We read the opinion of the Ninth Circuit Court as sanctioning a policy aimed at a completely contrary result and, therefore, do not feel the law allows us to sanction the use of dispersion technology without associated constant control technology." [19]

It is against this background that the EPA now argues that it has just received Nevada's variance and revision implementation plan and has not had time to act on the same and therefore, it argues, Kennecott has not given the Administrator proper notice of its intent to sue. In these circumstances, this Court finds that the EPA has had ample notice and that the notice requirements of the statute have been met.

Therefore, this Court finds no obstacle proffered by way of jurisdictional requirements that precludes the entertainment of the present action.

A preliminary injunction may be issued to protect the plaintiff from irreparable injury and to preserve the Court's power to render a meaningful decision after a trial on the merits. While the grant or denial of a preliminary injunction rests in the sound discretion of the Court, the Court must exercise its discretion in accordance with the prerequisites for the extraordinary relief of preliminary injunction. It is gen-erally recognized that four factors affect the exercise of that discretion, which are: (1) a substantial likelihood that the plaintiff will prevail on the merits, (2) a substantial threat that the plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may cause to the defendant, and (4) the granting of the preliminary injunction will serve the public interest.

During oral arguments on November 4, 1976, defendant EPA pressed only one of the factors, namely, that Kennecott has not demonstrated that there is a substantial likelihood that plaintiff will prevail on the merits. EPA admitted that it did not seriously contest that Kennecott had established factors 2, 3 and 4 above.

Kennecott contends that it is entitled to the issuance of a preliminary injunction and a writ of mandamus because the EPA has refused to carry out a nondiscretionary duty, namely, to approve the aforementioned one-year variance revising the Nevada plan. Kennecott alleges this duty is nondiscretionary because the state granted the variance and revision on grounds of economic infeasibility. Further, since the Supreme Court has recognized (1) the legitimacy of the use of variances and revisions to state implementation plans by the states in tailoring individual relief, and (2) the state's primary role in determining economic infeasibility under the Clean Air Act, the Administrator has no choice but to approve the variance and revised plan as presented.

The EPA, on the other hand, states that the Administrator cannot approve the one-year variance and revised plan because the revised Nevada plan does not comply with the 1970 Clean Air Act Amendments. As stated, the defendant premises this contention on the argument that the Nevada changes are defective because they do not call for the employment of constant emission control devices but, instead, rely on the use of supplemental control systems to curtail the pollutants. The defendant states flatly that the use of constant emission

19. Exhibit "C", Attachment 2, Appendix D.

controls is necessarily mandated under the Clean Air Act and case law.

As stated, on October 7, 1976, the State of Nevada, pursuant to Nevada Revised Statutes 445.506, granted for one year only a variance and revision of the current implementation plan which, in effect, permitted Kennecott to avoid the requirement called for in the current implementation plan, of constructing an acid plant, and allows Kennecott to operate using intermittent control devices, as well as dispersal technique. The use of the variance by the states, as a device to provide tailored relief on a source by source basis, was the topic of much debate until the Supreme Court decision in *Train v. Natural Resources Defense Council*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). In *Train*, an EPA approval of a state variance procedure was under attack by the NRDC. The EPA's approval of the State's variance provision was based on its interpretation of § 110(a)(3) of the Clean Air Act. The EPA concluded that § 110(a)(3) permitted a state to grant individual variances from generally applicable emission standards, both before and after the attainment date, so long as the variance does not cause the plan to fail to comply with the requirements of § 110(a)(2). The Supreme Court upheld the Administrator's interpretation stating that, while it is the EPA's responsibility to set the national ambient air standards, each individual state has the "primary responsibility for assuring air quality within the entire geographic area comprising such State . . ." (421 U.S. at 64, 95 S.Ct. at 1474)

This grant of power to the states was recently re-enforced in *Union Electric Company v. EPA et al.,* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). In *Union Electric*, the Supreme Court affirmed the role of the variance:

> "Moreover, if the industry is not exempted from, or accommodated by, the original plan, it may obtain a variance, as petitioner did in this case; and the variance, if granted after notice and a hear-

ing, may be submitted to the EPA as a revision of the plan."
(427 U.S. at 266, 96 S.Ct. at 2529, 49 L.Ed.2d at 488)

In addition, the Court noted that so long as the national air quality standards are met, the states are at liberty to select whatever combination or mix of controls they desire. The Court went on to state, placing in proper perspective, the respective roles of determining technological and economic infeasibility as between the EPA and the states:

> "Perhaps the most important forum for consideration of claims of economic and technological infeasibility is before the state agency formulating the implementation plan."
(427 U.S. at 266, 96 S.Ct. at 2529, 49 L.Ed.2d at 488)

And finally, it should be noted, that the Court stated, in addressing an issue which involved the proper scope of review by the EPA of a state plan:

> ". . . we agree that Congress intended claims of economic and technological infeasibility to be wholly foreign to the Administrator's consideration of a state implementation plan."
(427 U.S. at 256, 96 S.Ct. at 2525, 49 L.Ed.2d at 483)

While Kennecott and EPA agree that the State of Nevada may, by a variance and revision of its plan, grant relief from the requirements of the implementation plan because of economic infeasibility, EPA insists, however, that when the state chooses to do so, any variances from the current implementation plan must contain as a minimum the use of constant emission reduction equipment as the primary means for meeting the national air quality standards. Therefore, in the context of the facts before this Court, the dispositive issue is whether the Clean Air Act Amendments mandate as a minimum the use of constant control techniques.

Defendant EPA has taken the position that the Administrator cannot approve an implementation plan which solely relies on dispersion techniques or intermittent pro-

duction techniques, as opposed to continuous emission reduction technology, as the means of achieving specified air quality standards, because the use of constant emission control techniques is as a minimum necessarily mandated under the Clean Air Act. As support for this contention, EPA relies on *Kennecott Copper Corporation v. Russell Train*, 526 F.2d 1149 (9th Cir. 1975), cert. denied, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976); *Big Rivers Electric Corporation, et al. v. EPA*, 523 F.2d 16 (6th Cir. 1975), cert. denied, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *Natural Resources Defense Council v. EPA*, 489 F.2d 390, 410 (5th Cir. 1974), reversed in part on other grounds sub nom., *Train v. Natural Resources Defense Council*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). This Court does not believe that these cases hold that constant emission reduction control devices are in all cases necessarily required under the Clean Air Act. While this Court feels its position is the correct one, it is aware of the caveat in Mr. Justice Rehnquist's opinion in *Train v. NRDC*, 421 U.S. at p. 87, 95 S.Ct. at p. 1485:

"We therefore conclude that the Agency's interpretation . . . was 'correct,' to the extent that it can be said with complete assurance that any particular interpretation of a complex statute such as this is the 'correct' one."

This Court feels that the EPA has read more into these cases than careful analysis can sustain. While it appears from these cases consistent with the Supreme Court decisions in *Train v. NRDC and Union Electric*, supra, that Congress intended that the requirements of implementation plans would, whenever possible, be met by the employment of constant control emission limitations, it is quite another thing to maintain that the Clean Air Act necessarily requires the employment of such constant control limitations in this case in which the state has found the same economically infeasible for the variance period of one year only.

In considering the Clean Air Act, the Courts of Appeals for the Ninth Circuit, Sixth Circuit, and Fifth Circuit have held that constant emission control techniques may be required absent a showing that they are infeasible, either in a technological or economic sense. In *Natural Resources Defense Council, Inc. v. EPA*, supra, the Fifth Circuit sustained an objection, raised by the NRDC, to a state dispersion strategy for the control of pollutants as evidenced in their implementation plan. The Fifth Circuit added, however, that dispersion techniques might be included if there was a showing of unachievability or infeasibility. The Court stated:

"[The federal standard] allows dispersion techniques to be used only if there is a demonstration that 'emission reduction sufficient to meet [the national standards] in the time specified (3 years) is unavailable or infeasible . . .'

"This standard implies that a control strategy such as Georgia's tall stack strategy may be included in a state's plan only under one of two conditions. It may be included only (1) if it is demonstrated that emission limitation regulations included in the plan are sufficient *standing alone*, without the dispersion strategy, to attain the standards, or (2) if it is demonstrated that emission limitation sufficient to meet the standard is unachievable or infeasible, and that the state has adopted regulations which will attain the maximum degree of emission limitation achievable." (Emphasis provided.) (489 F.2d at 410)

Thus, the Fifth Circuit would not allow the use of dispersion techniques absent a showing of some type of infeasibility. In the instant case, there has been a determination of economic infeasibility by the State of Nevada.

In *Big Rivers Electrical Corp. v. EPA*, 523 F.2d 16, the Sixth Circuit addressed the issue of whether the Administrator of the EPA properly disapproved a state plan which would have allowed the use of intermittent controls without a showing that constant emission controls were unavailable. The Court, in holding that the Administrator acted within the scope of his authority, stated that the requirements of

Section 110(a)(2) of the Clean Air Act, 42 U.S.C. § 1857c–5(a)(2), could not permit approval of "alternative control strategies" without a demonstration that constant emission controls are technologically infeasible. At page 17 the Court stated:

"The underlying question in this case is whether the Administrator of the Environmental Protection Agency (EPA) properly disapproved a state regulation . . . which would have authorized coal-burning plants ('sources' in the Act) to employ 'alternate control strategies' for the control of air pollution by sulfur oxide gases without showing that constant emission controls of such pollutants are unavailable."

At page 22, the Court stated:

"The Administrator determined that the provision of the Kentucky Plan which he disapproved was susceptible of a construction which would permit state approval of measures not within the definition of 'emission limitations,' without a showing that measures which satisfy that definition were unavailable."

(523 F.2d 16)

In essence, therefore, the Sixth Circuit held the EPA acted correctly in disapproving a plan which might permit the use of air pollution controls, other than constant control emission reduction devices, without a demonstration that such constant control emission limitation techniques were unavailable. In the case at hand, no such obstacle exists. In *Big Rivers*, there was no showing that constant control emission limitations were unavailable.

Here, it has been determined by the State of Nevada, through the use of a one-year variance and revision of the Nevada plan, two devices recognized by the Supreme Court in *Train* and *Union Electric*, supra, that it is presently economically infeasible for Kennecott to install an acid plant, a constant emission control system.

Finally, in *Kennecott Copper Corporation v. Train*, supra, the third and final case relied upon by the EPA to support its contention that constant emission control techniques are necessarily mandated under the Clean Air Act, the Ninth Circuit held that dispersion systems should be used only when continuous emission controls are not economically feasible. In that case, Kennecott challenged part of an implementation plan adopted by the EPA which would require, in the future, the installation of additional constant emission control equipment. Kennecott asserted that the EPA was not authorized to require continuous emission reduction techniques in preference to intermittent controls or other methods of dispersion so long as the national air standards were maintained. The Ninth Circuit disagreed, stating that the use of dispersion techniques should only be used when continuous emission controls are not economically feasible:

"EPA based its order upon an interpretation of the Clean Air Act which requires that national air quality standards be met by continuous emission limitations to the maximum extent possible, and that intermittent controls and dispersion systems by [sic] used only when continuous emission controls are not economically feasible." (526 F.2d at 1150)

Again, the *Kennecott* case is distinguishable from the situation at hand. As stated before, the State of Nevada, through the valid mechanisms of the variance and plan revision procedures, has determined that for one year it is economically infeasible for Kennecott to install the constant emission control device as commanded by the EPA.

Thus, the situation presented to this Court appears to be one of first impression. This case, unlike those in the three cases relied upon by the EPA, which cases did not hold that constant emission control techniques were necessarily mandated under the Clean Air Act but, rather, held where there has been no showing of technological or economic infeasibility, constant emission limitations are required. In this case, a showing of the economic infeasibility has been made.

Therefore, it is this Court's conclusion that neither the Clean Air Act nor applicable case law mandates the employment of constant emission control tech-

niques as a necessary requirement but, rather, other supplemental control systems may be used when it is determined by the proper authority that such constant emission control systems are economically infeasible. Further, this Court finds that the State of Nevada was the proper authority to make such a finding and that it is binding on the Administrator of the EPA. Having resolved the first element necessary for injunctive relief in favor of Kennecott, namely, that the plaintiff is likely to prevail on the merits, and concluding that Kennecott will suffer irreparable injury if the injunction is not granted, that the threatened injury to Kennecott outweighs any harm the injunction may do to the EPA, and that the granting of the preliminary injunction will serve the public interest, this Court will grant the preliminary injunction sought by Kennecott in its complaint.

This opinion constitutes this Court's findings of fact and conclusions of law.