The DOW CHEMICAL COMPANY, a Delaware Corporation, Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle, Respondents.

Nos. 78–3139, 78–3595 and 80–3260.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 9, 1980.

Decided Dec. 9, 1980.

Rehearing Denied Feb. 9, 1981.

William C. Potter, Jr., Fischer, Franklin, Ford, Simon & Hogg, Detroit, Mich., for petitioner in all cases.

Francis E. Bentley, Detroit, Mich., for petitioner in 78-3139 and 78-3595.

R. L. Davis, Senior Atty., Michigan Division, Dow Chemical Co., Midland, Mich., for petitioner in 78-3139 and 80–3260.

Dorothy M. Attermeyer, Asst. Regional Counsel, E. P. A., Chicago, Ill., Lydia N. Wegman, Christina Kaneen, General Counsels, E. P. A., Washington, D. C., for respondents in 78–3139 and 78–3595.

Charlotte Uram, Pollution Control Section, Land & Natural Resources Division, Dept. of Justice, Washington, D. C., for respondents in all cases.

Lee F. Nute, Midland, Mich., for petitioner in 78-3595.

Environmental Protection Agency, General Counsel's Office, Washington, D. C., for respondents in 80–3260.

Before EDWARDS, C. J., and PHILLIPS and PECK, Senior Circuit Judges.

EDWARDS, Chief Judge.

We deal here with three petitions filed by The Dow Chemical Company seeking review of decisions of respondent, United States Environmental Protection Agency, under the Clean Air Act, 42 U.S.C. § 7401 *et seq.* (Supp. II 1978). These decisions designated Midland County as a "nonattainment area" (Appeal Nos. 78–3139 and 78–3595) and refused to approve a state approved revision of Michigan's "State Implementation Plan" (Appeal No. 80–3260). These appeals were consolidated by order of this court when it became apparent that they presented basically the same issue.

We recognize at the outset that this case is not comparable to the many clean air petitions which have previously been heard by this court. In these prior cases, many industries have demonstrated obdurate resistance to the national effort to achieve national air quality standards. *Cincinnati Gas & Electric Co. v. EPA*, 578 F.2d 660 (6th Cir. 1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1017, 59 L.Ed.2d 72 (1979); *Cleveland Electric Illuminating Co. v. EPA*, 572 F.2d 1150 (6th Cir.), *cert. denied*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978).

In contradistinction, this record shows that even before the 1970 Clean Air Act was adopted, Dow Chemical laid plans for a permanent solution to its then and currently existing sulfur dioxide pollution problems. At the same time, Dow recognized that it would take years to achieve the permanent solution by which Dow committed itself to one–third participation in the building of Consumers Power's nuclear power plant to supply all the power needed for Dow's Midland plants. As a result, Dow also put in operation an alternative to the burning of high sulfur coal in its old power plants in the form of a Supplementary Control System (SCS) for temporary use of low sulfur oil on occasions when its normal emission of $SO_2$ pollutants would otherwise occasion the atmospheric pollution in Midland County to exceed national air quality standards. The parties agree that this SCS, geared to 24–hours–a–day and 7–days–a–week meterological control through satellite weather observation, has succeeded in preventing any monitor–recorded instance of actual violation of national air quality standards in Midland County during the interim years.

It is an interesting contrast to note that at least 20 counties and portions of counties in Ohio are listed by EPA as in violation of national air quality standards. In Michigan, EPA lists no county in the state, except Midland County, as in violation of national air quality standards. And Midland is in violation only because, according to United States EPA, Congress has refused to accept any intermittent or temporary remedial measures as effective for purposes of determining national air quality standards.

From this description of our current problem, it might be deduced that the panel which heard this case is inclined by its previous contrasting experiences toward exercise of any judicial discretion it might have favorably to Dow. While this is true, unfortunately for Dow, our review of this record and the applicable statutory provisions indicates that Congress, in the exercises of its legislative powers, has dealt specifically with the identical issue raised by Dow and has foreclosed judicial relief.

As we see the issues in these appeals, they should be phrased as follows:

1) Did Congress in the 1977 Amendments to the Clean Air Act prohibit consideration of any intermittent system designed to reduce excessive pollution emissions temporarily in United States EPA's determination of achievement of national air quality standards?

2) If so, was it arbitrary and capricious for United States EPA to refuse to approve a revision to the Michigan State Implementation Plan to which the Michigan Air Pollution Control Commission had consented?

We answer the first of these questions in the affirmative and the second in the negative.

As to the first issue in this case, Dow claims basically that Midland County should have been and should now be designated as an "attainment area" because there have been no monitored violations since Dow began to use its supplementary low sulfur oil burning system. As indicated above, whatever logic this argument may have, United States EPA argues that Dow cannot be in compliance and that Midland County cannot be granted an attainment designation, since Dow does not *continuously* limit sulfur dioxide pollution from its stacks.

It is EPA's position, strongly disputed by Dow, that the 1977 Amendments to the Clean Air Act adopted by Congress were designed to clarify the 1970 Clean Air Act so as to show that national standards must be met by constant control of emissions.

As to this issue the confrontation between the parties is over whether or not Dow's SCS is in fact one which "limits the quantity, rate or concentration of emissions of air pollutants on a continuous basis...." Dow also argues, however, that while "constant controls are the preferred means to obtain compliance," intermittent controls used on an interim basis are permissible where there is a showing that constant controls are economically or technologically infeasible. *Citing Kennecott Copper Corp. v. Train*, 424 F.Supp. 1217 (D.Nev.1976), *rev'd on other grounds sub nom., Kennecott Copper Corp. v. Costle*, 572 F.2d 1349 (9th Cir. 1978). In relation to this issue, the EPA cited and relied on *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Kennecott Copper Corp. v. Train*, 526 F.2d 1149 (9th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976); and *Big Rivers Electric Corp. v. EPA*, 523 F.2d 16 (6th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). As to these cases, Dow argues that they "expressly hold" that an interim system like Dow's can be used where there is no other "economically and/or technologically feasible alternative."

We do not attempt to resolve this dispute, since these cases were all decided before 1977 and in our view, Congress resolved the argument contrary to Dow's contention in the 1977 Amendments. 42 U.S.C. § 7602(k) (1978) now provides:

The terms "emission limitation" and "emission standard" mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction.

In addition, in 1977 Congress added a new Section 123(a) (42 U.S.C. § 7423(a)) stating that "[t]he degree of emission limitation required" by a SIP "shall not be affected in any manner" by the use of excessive stack heights or "any other dispersion technique," and a new Section 123(b) (42 U.S.C. § 7423(b)) defining "dispersion technique" to include *"any intermittent or supplemental control of air pollutants varying with atmospheric conditions."* (Emphasis added.)

We have read and considered the language relied on by Dow from House and Senate legislative history written prior to adoption of the 1977 Amendments. We recognize that some of the language relied upon by Dow does seem to conflict with what we believe to be the obvious and unambiguous language of the 1977 statutory provisions quoted above.

█ It is, however, a cardinal rule of statutory interpretation that the courts do not turn to legislative history to shed light on the meaning of easily understandable and unambiguous statutory enactments. *See Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979); *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1280, 6 L.Ed.2d 575 (1961).

We do not believe that other sections of this complicated statute relied on by Dow convey discretion to United States EPA to

approve as an SIP revision the Michigan Air Pollution Control Commission's grant of a variance under the facts recorded here. Dow is now emitting from its aging power plants 39,809 tons of $SO_2$ per year. Due to dispersion among a number of stacks and to relatively low $SO_2$ pollution from other sources in the same county, Dow's emissions have not caused Midland County monitors to show violations of national air quality standards.

The total quantity of Dow's emissions, however, is not being reduced–nor will it be–until 1984 at the *earliest*. This means, of course, that absent EPA's order, Dow's $SO_2$ pollutants will continue to damage the air and the environment both in Midland County and downwind therefrom until Consumer's nuclear plant comes on line. This appears to be the exact sort of fact situation which Congress had in mind in adopting the 1977 Clean Air Act Amendments. H.R.Rep.No.294, 95th Cong., 1st Sess. 84–87, 128–33, *reprinted in* [1977] U.S.Code Cong. & Ad.News, pp. 1077, 1162–65, 1207–11. *See* Appendix following.

Since we find §§ 123(a) and (b) (42 U.S.C. §§ 7423(a) and (b) (1978)), to be clear and unambiguous, we hold that these amendments required the United States EPA's decision, and now require our approval thereof. The holding requires the answer we have already set forth to the two questions posed by this case.

The petitions for review are denied.

APPENDIX

HOUSE REPORT NO. 95–294

Interstate and Foreign Commerce Committee

May 12, 1977

(To accompany H.R. 6161)

*   *   *   *   *   *

The fundamental policy objections which have been raised to the use of tall stacks, intermittent or supplemental controls, and other dispersion techniques are as follows:

1. *Even for the purpose of attaining and maintaining the national ambient air quality standards, these methods are of dubious reliability and enforceability.*

This point has been made repeatedly by many persons and groups. One of the groups which have expressed these doubts is the National Academy of Sciences. The NAS points out that the effectiveness of intermittent control systems depends on accurate meteorological forecasting; quick response to adverse air quality readings; proper placement, maintenance, and calibration of monitors, among other factors.

*   *   *   *   *   *

2. *Intermittent control systems do not help to reduce the derivative pollutants of sulfur oxides (sulfates, sulfites, sulfuric acid) or oxides of nitrogen (nitrates, nitrites, nitric acid, nitrosamines); in conjunction with tall stacks, ICS may thus increase the health risks associated with $SO_2$ and $NO_2$ emissions.*

The Environmental Protection Agency has found–and the National Academy of Sciences has confirmed–that sulfates, sulfites, and sulfuric acid appear to be "more toxic than the parent compound [sulfur dioxide] and appear likely to be responsible for a substantial portion of adverse effects on health associated with stationary source combustion of fossil fuels". NAS has also found,

* * * The application of tall stacks and/or intermittent control systems will not reduce total emissions of sulfur oxides to any significant degree; thus this strategy does not decrease the total amount of sulfate in the regional atmosphere.

Similarly, one of the papers contained in the HEW–NIEHS Rall Report, conducted at the request of the Office of Management and Budget concluded,

In view of the possible toxicity of suspended sulfates, it should be noted that emission control measures designed to disperse sulfur dioxide from point sources, that is, tall stacks, will not have a major effect on suspended sulfate levels despite producing a decrease in local ambient sulfur dioxide concentration.

In fact, the same report expressed concern that "there is some evidence that local control of SO₂ (by higher stacks, and so forth) is leading to a wider dissemination of particulate sulfates."

The *National Academy of Sciences* has expressed even greater concern about the effects of tall stacks and intermittent controls for dealing with oxides of nitrogen than for SO₂. As the NAS explained,

> * * * Nitric oxide converts to nitric acid and nitrates faster than sulfur dioxide converts to sulfuric acid and sulfates; and since the reaction products precipitate, there is greater potential for local impact.

At least in part because of the adverse impact of these derivative pollutants, the National Academy of Sciences has recommended a compromise.

> The tall stack–ICS technology could be rejected as a permanent control technique on the basis of substantial potential risks associated with increased atmospheric loading of sulfur compounds. At the same time, the technology could be accepted for carefully defined situations as an interim control technique.

The Ford administration essentially agreed with these conclusions and recommendations. The Ford administration bill in 1975 (H.R. 2633) would have authorized the use of intermittent controls only on an interim basis; constant controls would have been required as a permanent or final compliance strategy. (H. 40, 156, 1181). Testimony from the State of Illinois agreed that intermittent controls should be permitted only on an interim basis. (H. 1308) Illinois' position is reflective of that taken by the State and Territorial Air Pollution Program Administrators.

3. *Use of tall stacks spreads the pollution, subjects areas to risk which were not previously exposed, and exports the problem to other areas and States, where it is too late to control the pollution.*

This point was made by the National Institute of Environmental Health Sciences' Rall Report. The National Academy of Sci-

ences has also expressed concern about the long-distance transport phenomenon, which is encouraged by use of tall stacks and intermittent controls.

Even in 1907, it was apparent that pollution must be reduced at its source if injury were to be avoided downwind. For the U.S. Supreme Court in that year held that the State of Georgia had a right to sue a smelter in Tennessee which was emanating sulfur dioxide fumes which then traveled across the States' shared border causing harm in Georgia.

> It is a fair and reasonable demand on the part of a sovereign that the air over its territory should not be polluted on a great scale by surfurous acid gas, that the forests on its mountains, be they better or worse, and whatever domestic destruction they have suffered, should not be further destroyed or threatened by the act of persons beyond its control, that the crops and orchards on its hills should not be endangered from the same source. * *

> The proof requires but a few words. It is not denied that the defendants generate in their works near the Georgia line large quantities of sulfur dioxide which becomes sulfurous acid by its mixture with the air. It is hardly denied and cannot be denied with success that this gas often is carried by the wind great distances and over tracts of Georgia land. On the evidence the pollution of the air and the magnitude of that pollution are not open to dispute * * * we are satisfied by a preponderance of the evidence that the sulfurous fumes cause and threaten damage on so considerable a scale to the forests and vegetable life, if not to health, within the plaintiff State as to make out a case within the requirements of *Missouri v. Illinois*, 200 U.S. 496 [26 S.Ct. 268, 50 L.Ed. 572]. * * *

> * * * the plaintiff now finds * * * that the tall chimneys in present use [since the complaint was filed] cause the poisonous gases to be carried greater distances than ever before and that the evil has not been helped.

In the committee's view, what Justice Holmes and the Supreme Court knew and explained in 1907 cannot be ignored nearly 70 years later. This is particularly so in light of the fact that the NAS and NIEHS reports of the most current scientific evidence confirm the knowledge of seven decades ago.

4. *If SO$_2$ and NO$_2$ emissions are merely dispersed by tall stacks and intermittent controls and are not reduced, these emissions will be converted to acid rain in significant amounts. Acid rain reduces soil productivity, harms vegetation, crops, buildings, and materials, and may jeopardize segments of the whole economy of certain areas,*

The increasing acidity of rainfall has been noted in many areas–England, Scotland, Norway, Sweden, Brazil, and the States of the Northeastern United States. Cornell, Yale, and Dartmouth scientists have documented this trend.

As the acidity of rainfall increases, the productivity of forest and agricultural lands are threatened. The 1972 report of the Swedish Government to the United Nations Conference on the Human Environment concluded that continued sulfur oxide emissions from England and Germany could reduce Swedish forest yields by 3–15 percent in the next 30 years.

Similar concerns have been expressed by the National Academy of Sciences. The concentration of both sulfates and nitrates in precipitation have increased in the past 20 years, and these increases appear to be associated with the increases in high level emissions (that is, emissions from tall stacks).

Furthermore, the NAS has predicted, that if sulfur oxide emissions are allowed to double between 1970–80, the average acidity of rain in the Northeast is likely to increase as much as 300 percent.

Effects of acid rain on natural systems are probably of greater consequence than effects of sulfur dioxide, especially if emissions are permitted to increase * * *.

Identifiable effects of acid rain include acidification of soil, reduction in forest productivity, and depletion of freshwater fish populations. The full impact of these effects may be delayed for years or even decades. * * *.

The possibility of large additional effects, such as extensive injury to valuable ornamental plants or reduction in agricultural productivity, cannot be dismissed, especially if the acidity of precipitation is permitted to increase * * *.

The possibility of effects on weather and climate cannot be dismissed.

The NAS also concluded that acid rain could increase corrosion, damage materials, and reduce property values. Therefore it concluded, "These effects point to the desirability of controlling the amount of man–produced sulfur compounds emitted into the atmosphere."

H.R.Rep.No.294, 95th Cong., 1st Sess. 82–86, *reprinted in* [1977] U.S.Code Cong. & Ad. News, pp. 1077, 1160--64 (footnotes omitted; emphasis in original).