**KENNECOTT COPPER CORPORATION, NEVADA MINES DIVISION, McGILL, NEVADA, Appellee,**

v.

**Douglas M. COSTLE, Administrator, Environmental Protection Agency, Appellant.**

No. 77–1359.

United States Court of Appeals, Ninth Circuit.

April 5, 1978.

---

Hauk, District Judge, sitting by designation, filed an opinion dissenting in part and concurring in part.

Jerome Ostrov (argued), Washington, D. C., for appellant.

Alfred V. J. Prather (argued), of Prather, Seeger, Doolittle, Farmer & Ewing, Washington, D. C., for appellee.

Before GOODWIN and SNEED, Circuit Judges, and HAUK,* District Judge.

SNEED, Circuit Judge:

This appeal requires us to determine whether a district court under the circumstances of this case has jurisdiction to grant a preliminary injunction requiring the Environmental Protection Agency (EPA) to approve a variance from the requirements of a State Implementation Plan (SIP) properly promulgated under the terms of the Clean Air Amendments of 1970 (formerly 42 U.S.C. §§ 1857 et seq., currently 42 U.S.C. §§ 7401 et seq.; citations generally will be to the sections of the 1970 Amendments rather than to the codified version). In view of the procedural posture of this case and the law applicable to it, we hold that the district court either lacked power to grant, or should not have granted, such relief. We thus set aside the district court's preliminary injunction and remand this case to the district court, with instructions to enter an order dismissing the action.

## I.

### Procedural History.

This action, which we designate as *Kennecott* II, is merely the latest stage in a continuing battle between Kennecott Copper Company and the EPA as to the appropriate methods of pollution control to be employed at Kennecott's smelter in McGill, Nevada. A brief review of the procedural history of this controversy at this point will be helpful.

The SIP proposed by Nevada pursuant to § 110 of the Clean Air Amendments of 1970 (42 U.S.C. § 7410) was approved by the EPA except for, *inter alia*, the provisions pertaining to control of sulfur dioxide. Following the statutory mandate, the EPA promulgated $SO_2$ emission limitations for Nevada. As applied to Kennecott's McGill smelter, these regulations required an acid plant capable of reducing $SO_2$ emissions by 60%, an intermittent control system (a tall stack and production curtailments) to assure maintenance of national ambient air quality standards, and a research program aimed at creating improved constant control technology capable of reducing $SO_2$ emissions by 86%.

Kennecott sought judicial review of this regulation pursuant to § 307(b)(1) of the

* Hon. A. Andrew Hauk, United States District Court Judge, for the Southern District of California, sitting by designation.

Clean Air Amendments of 1970 (42 U.S.C. § 7607(b)(1)), which provides for direct review in the applicable Court of Appeals. This court, in what we designate as *Kennecott I*, upheld the EPA regulations, holding that "air quality standards must be met by continuous emission reduction controls so far as possible." *Kennecott Copper Corp. v. Train*, 526 F.2d 1149, 1159–60 (9th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976). Kennecott, in objecting to the research program requirement, took the position that the EPA was "not authorized to require continuous emission reduction techniques in preference to intermittent controls or other methods for dispersion, or dilution, of pollutants" when the combination of such techniques and other controls devised by the state in its SIP would "attain and maintain national air quality standards within the statutory time periods." *Id.* at 1152. Under such circumstances the EPA must approve the state's SIP, argued Kennecott.

We rejected this contention and sustained the EPA's research program requirement. In doing so, we held that national ambient air quality standards must be met to the extent feasible by constant emission controls. A state plan which meets these standards by not utilizing feasible constant emission controls must be rejected under the authority of section 110(a)(2)(B) of the Clean Air Amendments of 1970. In so holding we took special note of the fact that, because EPA has undertaken to assure Kennecott that under its interpretation of the statute economically infeasible constant emission controls would not be required, "EPA could not compel Kennecott to install additional emission reduction systems at McGill unless it were economically feasible for Kennecott to do so." *Id.* at 1160. Inasmuch as Kennecott in *Kennecott I* did not object to the SIP requirement of an acid plant capable of reducing emissions by 60%, we assumed that the requirement was considered by both Kennecott and EPA as economically feasible. *Id.* at 1151.

Subsequent to the decision in *Kennecott I*, the company decided that construction of any acid plant was economically infeasible. This conclusion was based on an asserted multimillion dollar rise in the cost of constructing the acid plant and a decline in the price of copper. Since the EPA was planning to enforce the regulations which had been approved in *Kennecott I* the company chose to shut down completely in July 1976, rather than to risk sanctions for noncompliance.

Kennecott's next step was to petition the State of Nevada to revise its SIP. The revision requested by Kennecott required only a 40% reduction in $SO_2$ emissions and allowed achievement of this reduction through production curtailments rather than by use of an acid plant. In addition, dispersion through a tall stack was recognized as an acceptable method by which the State would achieve compliance with national ambient air quality standards. Kennecott also sought a variance for one year which would exempt it from meeting any requirements other than those which, by one means or another, would enable the State to achieve the national standards. On October 1, 1976 the State Environmental Commission approved both the revision of the SIP and the variance. On October 7 both were submitted to the EPA for action pursuant to § 110(a)(3). *See Train v. Natural Resources Defense Council*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

Before the EPA had a chance to act on these submissions, however, Kennecott filed suit on October 12, 1976 against the Administrator of the EPA in the U.S. District Court for the District of Nevada. This action sought a declaratory judgment that the revision complied with the requirements of the Clean Air Amendments, a mandatory injunction or mandamus requiring the Administrator to approve the variance and the revision, and an injunction prohibiting the Administrator from enforcing the originally approved SIP or taking any other action to impede the operation of the McGill smelter. On November 24, 1976, the district court granted all the requested relief. 424 F.Supp. 1217 (D.Nev.1976). On April 25, 1977, this court granted the EPA's motion for a stay of the district court's order pending the determination of this appeal.

## II.

### The Issues.

The EPA attacks the jurisdiction of the district court to entertain this action. It first argues that § 307(b)(1) of the Clean Air Amendments of 1970 (42 U.S.C. § 7607(b)(1)) provides for exclusive jurisdiction in the appropriate Court of Appeals to review revisions of SIPs, thereby foreclosing this action at the district court level. The EPA further argues that § 304 of the Clean Air Amendments of 1970 (42 U.S.C. § 7604), the citizen's suit jurisdictional grant relied on by the district court, is inapplicable because the Administrator has discretionary responsibility in reviewing the state promulgated changes and because Kennecott failed to comply with the notice requirements of that section.

Kennecott responds by asserting that it is uncertain whether § 307 review is applicable to EPA denial of a revision of a SIP and that § 304 jurisdiction is appropriate because the Administrator has a mandatory duty to approve revisions of the SIP approved by the state which meet the requirements of § 110. Kennecott in support of § 304 jurisdiction argues that the Clean Air Amendments, as interpreted by the Supreme Court, give the states final authority in passing on the economic feasibility of such constant emission control systems as might be suggested by EPA. Kennecott makes the final argument that even if jurisdiction in the district court was technically improper, this court should consider the action as an original petition for review and hold that constant emission control systems are only required to the extent economically feasible and that a state's determination of economic infeasibility is binding on the EPA.

The district court, to establish its jurisdiction, relied primarily on section 304(a)(2) of the Clean Air Amendments of 1970 and secondarily on the Administrative Procedure Act, 5 U.S.C. § 701 et seq., federal question jurisdiction, 28 U.S.C. § 1331, and the Mandamus Act, 28 U.S.C. § 1361. Under the circumstances of this case we believe this reliance in its entirety was misplaced. Section 304(a)(2) does not afford

jurisdiction because the duty of the EPA to review the variance Nevada granted is one which is discretionary. With respect to the other jurisdictional grounds relied on by the district court we believe judicial intervention at this point in the administrative process to be either invalid or inappropriate. Therefore, we must set aside the district court's preliminary injunction and remand this proceeding to the district court with directions to enter an order dismissing this cause of action.

## III.

### Citizen Suit Provision—§ 304.

■ Section 304(a)(2) of the Clean Air Amendments of 1970 (42 U.S.C. 7604(a)(2)) provides that "any person may commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under the Act which is *not discretionary* with the Administrator." (Italics added). Its legislative history reveals that Congress recognized the potential for disruption of the administrative process inherent in a broad grant of jurisdiction to hear all cases involving the alleged failure of the Administrator to take actions authorized by the Act. Senate Comm. on Public Works, 93d Cong., 2d Sess., A Legislative History of the Clean Air Amendments of 1970, Serial No. 93–18, Vol. 1 at 278 (1970) [hereinafter cited as Legislative History]. Therefore, in the Conference Committee action on the bill, the words "which is not discretionary with the Administrator" were added to the end of § 304(a)(2). Explaining this change, it was stated that "citizen suits against the Administrator will be limited to those duties which are mandatory under the legislation and the suits will not extend to those areas of enforcement with regard to which the Administrator has discretion." Legislative History at 112. Thus, the non-discretionary duty requirement imposed by § 304 must be read in light of the Congressional intent to use this phrase to limit the number of citizen suits which could be brought against the Administrator and to lessen the disruption of the Act's complex administrative process.

Under the circumstances of this case, we are convinced that the Administrator does not have a *mandatory* duty to approve either the revision or the variance. The Supreme Court has clearly established that state promulgated variances and revisions are each to be dealt with by the Administrator under the procedures set out in § 110(a)(3). *Train v. Natural Resources Defense Council, supra* at 80, 95 S.Ct. at 1480. That section provides that "[t]he Administrator shall approve any revision of an implementation plan applicable to an air quality control region if he determines that it meets the requirements of paragraph (2) and has been adopted by the State after reasonable notice and public hearings." In *Train v. Natural Resources Defense Council* the Court observed, "Under § 110(a)(2), the Agency is *required* to approve a state plan which provides for the timely attainment and subsequent maintenance of ambient air standards, *and which also satisfies that section's other general requirements.*" (Immediately preceding italics added). 421 U.S. at 79, 95 S.Ct. at 1482.

■■■ Kennecott argues that the "shall approve" language in section 110(a)(3) and the Supreme Court's observation establish that the Administrator has a non-discretionary duty to approve such revisions. We cannot agree. It is clear that the Administrator has a non-discretionary duty to make a decision regarding the state revision. The Administrator, however, retains a good deal of discretion as to the content of that decision. The Supreme Court's observation set out above makes plain that the Administrator's duty to approve a revision depends, not only on whether there will be a timely attainment and maintenance of ambient air standards, but also on whether it satisfies the "other general requirements" of section 110(a)(2). Among those "other general requirements" is that which makes mandato-

ry the inclusion of "emission limitations" (§ 110(a)(2)(B)), which we interpreted in *Kennecott I* as requiring that the air quality standards be met to the extent feasible by constant emission controls. 526 F.2d at 1153–56. The determination whether a particular form of emission control is feasible is obviously a matter requiring an exercise of the Administrator's discretion. This is true without regard to whether the alleged infeasibility rests on economic or technological grounds. This conclusion cannot be rendered immaterial by reliance on the finding by the State of Nevada that the EPA's constant emission control requirements were economically infeasible. Such a finding is not binding on the Administrator. *See Bunker Hill v. EPA,* 572 F.2d 1286 (9th Cir. 1977). As we observed in *Bunker Hill,* there is no more reason to bind the Administrator to a state's finding of infeasibility than to a state's conclusion that its plan achieves in a timely fashion the ambient air quality standards. *Id.* at 1354. As the Supreme Court observed in *Train v. Natural Resources Defense Council,* quoted supra at 79, the Administrator must approve a revision only when the SIP, as revised, meets *all* the requirements of section 110(a)(2). Determining whether such is the case requires the fusion of technical knowledge and skills with judgment which is the hallmark of duties which are discretionary. To classify them as "not discretionary" to make available section 304(a)(2) jurisdiction is to stand words on their head in an effort to provide jurisdiction when Congress intended that none exist.[1] It is obvious that a concession by the Administrator that the SIP, as revised, permits the timely achievement and maintenance of ambient air quality standards could not transform the other discretionary duties of the Administrator with respect to the revision into "not discretionary" duties within the meaning of section 304(a)(2).[2]

---

1. Even the determination whether ambient air quality standards are being met is infused with discretion. The methodology is not precise, exact, and beyond dispute. *See Mision Industrial, Inc. v. EPA,* 547 F.2d 123, 128 (1st Cir. 1976).

2. Since we have decided that § 304 is not applicable because there is no non-discretionary duty owed by the Administrator, we do not have to decide whether the notice requirement of § 304 is jurisdictional and, if so, whether there was adequate notice in this case. *Com-*

Other cases which examine the non-discretionary duty requirement of § 304 support our conclusion. In *Natural Resources Defense Council v. Train*, 545 F.2d 320 (2d Cir. 1976), the court in affirming an order of a district court, the jurisdiction of which rested on section 304, considered whether the Administrator had a mandatory duty to include lead on the list of air pollutants pursuant to § 108 of the Clean Air Amendments of 1970. In holding that such a duty existed the court was obviously influenced by the fact that the Administrator's construction of section 108 would have equipped him with absolute power to determine whether lead should be placed on the list of air pollutants. In rejecting the Administrator's position, the court adopted a construction which required the Administrator to list lead after he had determined that lead has an adverse effect on public health and welfare and its presence in the ambient air results from numerous mobile and stationary sources. In this manner the court recognized that once the Administrator has performed his discretionary duties a mandatory duty to act upon those determinations in the prescribed manner can arise.

In the case before us Kennecott would have us permit the state to dictate to the Administrator how he should perform his discretionary duties and, following this usurpation, have the district court enforce the state's will. Our refusal to adopt this construction permits the Administrator to exercise his discretion in the manner the Administrator did in *Natural Resources Defense Council v. Train* when he determined that lead resulting from mobile and stationary sources was injurious to health and welfare. Once the Administrator, in the case before us, has determined that the revised SIP either does or does not meet all the requirements of § 110(a)(2) there is a nondiscretionary duty to act in accordance with his determination. Moreover, his determination, as will be pointed out, is not beyond the reach of proper judicial review. Thus, we need not adopt the characterization of "not discretionary" in order to avoid

what would otherwise be unlimited, unreviewable discretion.

*Wisconsin Environmental Decade, Inc. v. Wisconsin Power and Light Co.*, 395 F.Supp. 313 (W.D.Wis.1975) also supports our conclusion with respect to § 304 jurisdiction. The court, in considering the Administrator's duties under § 113 of the Clean Air Amendments, distinguished between the duties to notify both a violator of a state plan and the state, and to make a finding with respect to whether a violation occurred, on the one hand, and the duty to decide that a violation had occurred on the other. The latter was regarded as discretionary and not subject to review on the basis of jurisdiction resting on § 304, while the former two duties were regarded as "not discretionary," thus affording a basis for § 304 jurisdiction. This corresponds to the distinction we recognize between the Administrator's duty to decide whether Nevada's revised SIP meets all the requirements of § 110(a)(2) and his duty to decide in a particular manner. The former is not discretionary, the latter is.

The court in *Wisconsin Environmental Decade* properly noted that § 304 "was intended to provide relief only in a narrowly-defined class of situations in which the Administrator failed to perform a mandatory function; it was not designed to permit review of the performance of those functions, nor to permit the court to direct the manner in which any discretion given the Administrator in the performance of those functions should be exercised." *Id.* at 321.

We do not regard *Sierra Club v. Ruckelshaus*, 344 F.Supp. 253 (D.D.C.), affirmed on the basis of District Court opinion, 4 BNA Env.Rep. Cases 1815 (1972), *aff'd by an equally divided Court, sub nom. Fri v. Sierra Club*, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973), as contrary to our interpretation of § 304. The mandatory duty to prevent the degradation of clean air areas which the court held was imposed on the Administrator by the 1970 Amendments differs not from the mandatory duty to

pare *West Penn Power Co. v. Train*, 378 F.Supp. 941, 944 (W.D.Penn.1974), *aff'd on other grounds*, 522 F.2d 302 (3rd Cir. 1975), *cert.*

denied, 426 U.S. 947, 96 S.Ct. 3165, 49 L.Ed.2d 1183 (1976) *with Friends of the Earth v. Carey*, 535 F.2d 165 (2d Cir. 1976).

decide whether a revised SIP meets all the requirements of § 110(a)(2) which we recognize exists in this case. We express no opinion on *Sierra Club*'s interpretation of the statute; however, once its interpretation is accepted, jurisdiction in the district court under § 304(a)(2) follows. In a like manner, were we to accept the district court's interpretation of the Clean Air Amendments in the case before us we would be required to recognize its jurisdiction. We do not, as already indicated, accept that interpretation.

Our refusal to accept the district court's interpretation does not clash with *Union Electric Co. v. EPA*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). While it is true that the Supreme Court in *Union Electric Co.* observed that the state is "the most important forum for consideration of claims of economic and technological feasibility" (*id.* at 266, 96 S.Ct. at 2529), this remark was in the context of its holding that claims of economic or technological feasibility could not be used to invalidate an SIP which imposed stricter standards than those set by the EPA for national ambient air quality. By this holding the Court recognized that the 1970 Amendments permit states to engage in "technology forcing" beyond that required by the Act and that in this process a state properly could consider technological and economic feasibility. This consideration by a state required no similar consideration by the Administrator during his review of the state's plan. So long as the state demanded more of its residents than would the statute, the Administrator under *Union Electric Co.* can be indifferent to technological and economic feasibility of the state's plan.

The Court's more general language which suggests that technological and economic infeasibility are never factors to be considered by the Administrator in reviewing state implementation plans (*id.* at 257–58, 96 S.Ct. 2518) was not addressed to the issue this court faced in *Kennecott* I, *viz.*, whether the Clean Air Amendments required, by reason of § 110(a)(2)(B), that "national air quality standards be met by continuous emission limitations to the maximum extent possible" (526 F.2d at 1150).

In holding that such limitations were required "to the maximum extent possible," feasibility, at least in the technological sense, inescapably becomes relevant in determining whether § 110(a)(2)(B)'s requirement is met by the particular state plan. *See Bunker Hill v. EPA*, 572 F.2d 1286 (9th Cir. 1977), *aff'd and modified on rehearing*, 572 F.2d 1305. We do not view *Union Electric Co.* as in conflict with either *Kennecott* I or *Bunker Hill*.

## IV.

### *Other Bases for Jurisdiction.*

 Two additional bases of jurisdiction relied on secondarily by the district court can be disposed of quickly. *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) established that the Administrative Procedure Act, 5 U.S.C. § 701 et seq., is not an independent source of jurisdiction. In addition, the Mandamus Act, 28 U.S.C. 1361, is not applicable for the same reason § 304 fails to provide jurisdiction. That is, to invoke § 1361 the act to be compelled must be mandatory or ministerial and not discretionary. *Short v. Murphy*, 512 F.2d 374 (6th Cir. 1975); *United States v. Walker*, 409 F.2d 477, 481 (9th Cir. 1969). Moreover, the existence of alternate remedies, which we believe exist in this case, precludes reliance on § 1361. *Cartier v. Secretary of State*, 165 U.S.App.D.C. 130, 506 F.2d 191 (1974), *cert. denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975).

Federal question jurisdiction under 28 U.S.C. § 1331, also relied on by the district court, presents a more difficult issue. *Califano v. Sanders*, in foreclosing the Administrative Procedure Act as an independent source of jurisdiction, relied on the 1976 amendment to § 1331 which removed the amount in controversy requirement for suits brought against the United States. This strongly suggests that § 1331 provides a jurisdictional basis for the action of the district court in this case.

 We decline, however, to decide whether § 1331 so provides because, even if it does, first, the district court relied on

incorrect legal principles in granting the preliminary injunction, and, second, the relief granted interferes with the exercise of administrative discretion. These two reasons provide ample grounds for our setting aside the preliminary injunction of the district court.

The nature of the erroneous interpretation of the law by the district court already has been indicated. It consists of the belief that under the circumstances of this case the EPA was required to accept the State of Nevada's finding of economic infeasibility of EPA's constant emission controls. On this error rests the action of the district court in its entirety. Under these circumstances, we would be free to overturn the district court's preliminary injunction even if jurisdiction were to exist. *See, California ex rel. Younger v. Tahoe Regional Planning Agency*, 516 F.2d 215, 218 (9th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975).[3]

■ Our second reason for concluding that, even if § 1331 jurisdiction exists, intervention by the district court was improper rests on the view that until the EPA acts on the proposed revision of Nevada's SIP and variance it is improper to intervene judicially. While the doctrine of primary jurisdiction has not, to our knowledge, been applied to the EPA, its use with respect to the Interstate Commerce Commission, Railway Labor Board, and the National Labor Relations Board reflects a general concern with premature interference with the administrative process which we believe applicable to this case in its present posture.[4] Although it is likely the Administrator will act in due course to reject the proposed revision and variance on the ground that constant emission controls are not being employed to the "maximum extent possible," we believe it unwise presently to proceed on that assumption. We cannot close our eyes to the fact that this opinion is being written in the year 1978 and that in 1977 the Clean Air Act was significantly amended. Circumstances have changed; we should not assume that both Kennecott and the EPA are unchanged. In any event, at this point we are convinced the judiciary should stand aside. *Cf. Sampson v. Murray*, 415 U.S. 61, 68, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Far Eastern Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *Wilderness Society v. Morton*, 156 U.S.App.D.C. 121, 165, 479 F.2d 842, 886, *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

This conviction also precludes us from deciding whether the proceeding can be treated as an original petition for review under § 307 of the Clean Air Amendments of 1970. Prior to the 1977 Amendments considerable uncertainty existed with respect to whether the availability of § 307 review was to be broadly or narrowly construed. *Compare, Oljato Chapter of Navajo Tribe v. Train*, 169 U.S.App.D.C. 195, 515 F.2d 654 (1975) *with Utah Power & Light Co. v. EPA*, 180 U.S.App.D.C. 70, 553 F.2d 215 (1977) *and District of Columbia v. Train*, 175 U.S.App.D.C. 115, 533 F.2d 1250 (1976). The 1977 Amendments to the Clean Air Act (§ 305(c)(2), Pub.Law No. 95–95) amended § 307(b)(1) of the Act to provide for exclusive court of appeals review of "any other final action of the Administrator under this Act which is locally or regionally applicable." This enables us to stand aside, as we believe it proper to do, reasonably confident that in due course either the concern with the revision and variance will become moot or that final action with respect thereto by the Administrator will be subject to judicial review.

We reverse and remand with directions to dismiss the cause of action.

Reversed and Remanded.

---

**3.** Appellate court review of the grant of a preliminary injunction is normally limited to determining whether there has been an abuse of discretion. *Klaus v. Hi-Shear Corp.*, 525 F.2d 225, 228 (9th Cir. 1975). A well-recognized exception to this rule, however, allows the appellate courts to freely overturn the lower court action if it was based on an erroneous conclusion of law. *Douglas v. Beneficial Finance Co. of Anchorage*, 469 F.2d 453 (9th Cir. 1972).

**4.** *See generally* Davis, Administrative Law Treatise § 19 (1958 Ed.).

HAUK, District Judge, dissenting in part and concurring in part:

In the first place, I note that in Section III, the majority opinion takes up the issue of whether the EPA Administrator's duty vis-a-vis Kennecott was discretionary or nondiscretionary ("mandatory"); and concluding that it was discretionary, it reverses the District Judge's grant of the preliminary injunction, 424 F.Supp. 1217 (D.Nev. 1976) (*Kennecott II*), and orders the case dismissed. With the majority reasoning on this issue, I respectfully must disagree and, therefore, enter my dissent.

Here, in *Kennecott II*, EPA concedes that in taking up and considering the variance (revision) of the EPA Plan, it did not consider economic infeasibility which EPA claims was irrelevant. 424 F.Supp. at 1228. EPA further concedes that the variance (revision) did meet the national ambient air standards. *Id.* at 1224. Therefore, EPA had the *nondiscretionary* duty to approve the variance (revision). Clean Air Act, § 110(a)(3)(A), 42 U.S.C. § 1857c–5(a)(3)(A). And Kennecott, by the same token, had the legal right to utilize the Citizen Suit provision as the jurisdictional basis for its suit, and the preliminary injunction in the District Court correctly rests on that basis. Clean Air Act, § 304(a)(2), 42 U.S.C. § 1857h–2(a)(2).

On the other hand, in *Bunker Hill,* 572 F.2d 1286 (9th Cir. 1977), just as in *Kennecott I,* 526 F.2d 1149 (9th Cir. 1975), the plaintiff company was pursuing its suit in the Circuit Court for review of the respective EPA Plan by objections to the Plan under § 307(b)(1), 42 U.S.C. § 1857h–5(b)(1), the proper basis for jurisdiction in objecting to the promulgation of the Plan by EPA, a *discretionary* duty. These suits were, therefore, properly cognizable in the Circuit Court rather than the District Court, both in *Bunker Hill* and in *Kennecott I.*

I agree with *Bunker Hill,* 572 F.2d 1286, in its reference at page 1294, Footnote 13, to the effect that the District Judge may have used inappropriate and erroneous language when he "asseverated 'that the state of Nevada was the proper authority to make [a finding of economic infeasibility] and that it is binding on the Administrator of the EPA.'" However, it should be noted here, in this *Kennecott II* case, the EPA and its Administrator actually refused even to consider economic infeasibility, claiming it to be irrelevant; and further admitted that the national ambient air quality standards were being met. In this posture and situation, the District Court had before it, in EPA's refusal to approve the variance (revision), a clearly nondiscretionary act, and the District Court undeniably had jurisdiction under the Citizen Suit provision of the Clean Air Act, § 304(a)(2), 42 U.S.C. § 1857h–2(a)(2). It follows that the preliminary injunction granted by the District Court was appropriate and proper for the duration of the litigation.

This District Court preliminary injunction would give EPA an opportunity, if it should so change its mind, to take up and consider economic feasibility as it should have done in the first place, and at the same time to present to the District Court evidence on that fundamental facet of the case. Moreover, the District Court's preliminary injunction would give EPA the opportunity to present evidence, if it should so change its mind, upon the other and second fundamental facet, namely, conformance of the variance (revision) with national ambient air quality standards under § 110(a)(2), 42 U.S.C. § 1857c–5(a)(2), even though it had already admitted conformance of the variance (revision) before the District Judge.

Each of these two questions, it is respectfully submitted, should not be either ignored as to the first, or admitted as to the second, as EPA has done, unless EPA really intends to do so at the trial of the ultimate issue of this litigation, to wit, the granting or nongranting of a permanent injunction. Our affirming and keeping in force the preliminary injunction of the District Judge would preserve the *status quo* pending the final solution of these issues in the full trial before the District Judge that would be still to come.

Secondly, however, I concur in the majority opinion's Section IV in its discussion of the inapplicability of the Administrative

Procedure Act, 5 U.S.C. § 701 *et seq.*, as an independent source of jurisdiction, since I agree that *Califano v. Sanders* precludes such independent source of jurisdiction. Furthermore, I concur that the Mandamus Act, 28 U.S.C. § 1361, is inapplicable because of the existence of alternative remedies. And I further concur that the issue of federal question jurisdiction need not be considered or decided.

Finally, I concur that we are living and writing in the year 1978 and that in 1977 the Clean Air Act was significantly amended. As the majority points out, "Circumstances have changed; we should not assume that both Kennecott and the EPA are unchanged." Because of these amendments and changes which now mandate exclusive Court of Appeals review of "any final action of the Administrator," we in the judiciary "should stand aside," reasonably confident that either now or in due course the controversy before us is or will be moot, or in any event subject to judicial review of final EPA action.

Therefore, while I would not reverse the esteemed District Judge, I do concur in the disposition of this matter by joining with the equally esteemed Circuit Judges Sneed and Goodwin, in remanding the matter to the District Court for dismissal of the present cause of action herein.