885 F.2d 1067
 30 ERC 1513, 20 Envtl. L. Rep. 20,174
 NATURAL RESOURCES DEFENSE COUNCIL, INC., Plaintiff-Appellant,
v.
Lee M. THOMAS, Administrator, U.S. Environmental Protection
Agency, Defendant-Appellee,
and
The Acrylonitrile Group, Inc., Alabama Power Company, et
al., American Mining Congress, Association of Ethylene Oxide
Users, the Cadmium Council, Inc., Chemical Manufacturers
Association, the Ethylene Oxide Industry Council, the
Leather Industries of America, the Society of the Plastics
Industry, Inc., the Specialty Steel Industry of the United
States, American Paper Institute, and American Petroleum
Institute, Intervenors-Appellees.
 No. 642, Docket 88-6210.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 23, 1989.
Decided Sept. 18, 1989.
 
 David Doniger, Natural Resources Defense Council, Inc., Washington, D.C. (Eldon V.C. Greenberg, Galloway & Greenberg, Washington, D.C., Eric Goldstein, Natural Resources Defense Council, Inc., New York City, of counsel), for plaintiff-appellant.
 Charles S. Carter, U.S. Dept. of Justice, Washington, D.C. (Roger J. Marzulla, Asst. Atty. Gen. of U.S., Washington, D.C., Rudolph W. Giuliani, U.S. Atty., and Nancy Kilson, Richard W. Mark, Richard M. Schwartz, Asst. U.S. Attys. for S.D.N.Y., New York City, Robert L. Klarquist, Stephen L. Samuels, Jaques B. Gelin, Attys., U.S. Dept. of Justice, Lawrence J. Jensen, Gen. Counsel and Patricia A. Embrey, Office of Gen. Counsel to U.S.E.P.A., Washington, D.C., of counsel), for defendant-appellee.
 F. William Brownell, Washington, D.C. (Henry V. Nickel, Norman W. Fichthorn, Hunton & Williams, David H. Larry, Epstein Becker Borsody & Green, P.C., Neil J. King, A. Stephen Hut, Jr., Wilmer, Cutler & Pickering, David F. Zoll, Kathy Bailey, Chemical Mfg. Ass'n, Jerome H. Heckman, Peter L. de la Cruz, Susan T. Conti, Keller & Heckman, Anthony J. Thompson, Perkins Coie, Robert C. Barnard, Sara D. Shotland, Cleary, Gottlieb, Steen & Hamilton, Richard E. Schwartz, John L. Wittenborn, Collier, Shannon, Rill & Scott, Arthur F. Sampson, III, Kirkland & Ellis, Valerie J. Ughetta, American Petroleum Institute, Washington, D.C., of counsel), for intervenors-appellees.
 Before NEWMAN, PIERCE and MAHONEY, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Plaintiff-appellant, Natural Resources Defense Council, Inc. ("NRDC"), appeals from a judgment of the United States District Court for the Southern District of New York, Charles S. Haight, Jr., Judge, dismissing NRDC's complaint under section 304(a)(2) of the Clean Air Act (the "Act"), 42 U.S.C. Sec. 7604 (1982)[1], against Lee M. Thomas, the Administrator (the "Administrator") of the Environmental Protection Agency (the "EPA") for lack of subject matter jurisdiction. The opinion below is reported at 689 F.Supp. 246 (S.D.N.Y.1988).
 
 
 2
 Two jurisdictional provisions of the Act are arguably relevant here. Actions which seek to compel the Administrator to perform nondiscretionary acts or duties are to be brought in the district courts pursuant to section 304(a)(2) of the Act, 42 U.S.C. Sec. 7604(a)(2) (1982).[2] Petitions seeking review of action by the Administrator in promulgating any emission standard or requirement under section 112 of the Act, 42 U.S.C. Sec. 7412 (1982), may be filed only in the United States Court of Appeals for the District of Columbia pursuant to section 307(b)(1) of the Act, 42 U.S.C. Sec. 7607(b)(1) (1982).[3]
 
 
 3
 NRDC brought suit under section 304(a)(2) of the Act in the United States District Court for the Southern District of New York to compel the Administrator to add two metals (cadmium and hexavalent chromium) and six organic chemicals (acrylonitrile, carbon tetrachloride, chloroform, ethylene oxide, 1,3-butadiene and ethylene dichloride) (collectively the "Pollutants") to a list of hazardous air pollutants (the "List") that the EPA is charged with maintaining under Act Sec. 112(b)(1)(A), 42 U.S.C. Sec. 7412(b)(1)(A) (1982). The Administrator is required under Act Sec. 112(b)(1)(B), 42 U.S.C. Sec. 7412(b)(1)(B) (1982), to publish proposed regulations establishing emission standards for any pollutant within 180 days of its addition to the List, with a notice of public hearing within thirty days, and to prescribe an emission standard therefor within 180 days after such publication "unless he finds, on the basis of information presented at such hearings, that such pollutant clearly is not a hazardous air pollutant." Id.
 
 
 4
 NRDC contends that the Administrator is required to add the Pollutants to the List because each has been recognized as either a known or probable carcinogen in a series of notices (the "Notices") published by the EPA in the Federal Register.[4] NRDC argues that this recognition triggered a nondiscretionary duty on the part of the Administrator to add the Pollutants to the List, and thus created subject matter jurisdiction for this action in the district court under Act Sec. 304(a)(2).
 
 
 5
 During the proceedings below, potentially affected industry representatives named in the caption (the "Intervenors") were permitted to intervene pursuant to Fed.R.Civ.P. 24. The Administrator and the Intervenors moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, contending that no nondiscretionary duty on the part of the Administrator had been triggered by the Notices.
 
 
 6
 The district court ruled that since the conclusions reached in the Notices were preliminary and did not constitute statutory determinations that the eight pollutants were "hazardous air pollutants" within the meaning of Act Sec. 112(b)(1)(A), the Administrator's decision whether to list the Pollutants was discretionary and not reviewable in the district court.
 
 We affirm.Background
 
 7
 A. The Clean Air Act.
 
 
 8
 The Clean Air Act is a complex body of environmental legislation first enacted in 1955 and later amended substantially in 1970 and 1977.[5] It is intended "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Act Sec. 101(b)(1), 42 U.S.C. Sec. 7401(b)(1) (1982). In order to advance this objective, the Clean Air Act Amendments of 1970 adopted two regulatory approaches for controlling air quality.
 
 
 9
 Under the first approach, addressed to "criteria" pollutants regulated by Act Secs. 108-110, 42 U.S.C. Secs. 7408-7410 (1982), a complex federal/state relationship is established for the control of pollutants described in "criteria" listings issued by the Administrator pursuant to Act Sec. 108. Section 109 directs the Administrator to establish primary ambient air quality standards "to protect the public health" with "an adequate margin of safety," and secondary ambient air quality standards "to protect the public welfare," for each pollutant listed pursuant to section 108. Act Sec. 109(a) and (b). Section 110 requires the states in turn to implement emission controls to achieve the federal ambient standards.
 
 
 10
 Unlike the criteria pollutant program, the second approach is not based upon federal/state cooperation, but upon the Administrator's direct authority to establish and implement emission standards at a number of "stationary sources" pursuant to a variety of provisions of the Act. For example, Act Sec. 111, 42 U.S.C. Sec. 7411 (1982), empowers the EPA to establish emission standards for new stationary sources of air pollution. Act Sec. 221, 42 U.S.C. Sec. 7521 (1982), authorizes the Administrator to establish emission standards for new motor vehicles and new motor vehicle engines. Act Sec. 271, 42 U.S.C. Sec. 7571 (1982), provides similar authority with respect to aircraft.
 
 
 11
 B. Statutory Framework of Section 112.
 
 
 12
 Section 112, which was added to the Clean Air Act by the 1970 amendments, Pub.L. No. 91-604, Sec. 4(a), 84 Stat. 1685 (1970), is part of this second approach. It authorizes the Administrator to regulate the emission from stationary sources of any "hazardous air pollutant;" i.e., a pollutant to which no ambient air quality standard imposed pursuant to Act Sec. 109 is applicable, and which "in the judgment of the Administrator causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness." 42 U.S.C. Sec. 7412(a)(1) (1982).
 
 
 13
 Regulation under section 112 involves a two step process. The first step consists of the Administrator's listing hazardous air pollutants pursuant to Act Sec. 112(b)(1)(A), which provides:
 
 
 14
 The Administrator shall, within 90 days after December 31, 1970, publish (and shall from time to time thereafter revise) a list which includes each hazardous air pollutant for which he intends to establish an emission standard under this section.
 
 
 15
 42 U.S.C. Sec. 7412(b)(1)(A) (1982).
 
 
 16
 The second step of the process is the establishment by the Administrator of an emission standard for the pollutant pursuant to the timetable established by Act Sec. 112(b)(1)(B), which provides:
 
 
 17
 Within 180 days after the inclusion of any air pollutant in such list, the Administrator shall publish proposed regulations establishing emission standards for such pollutant together with a notice of a public hearing within thirty days. Not later than 180 days after such publication, the Administrator shall prescribe an emission standard for such pollutant, unless he finds, on the basis of information presented at such hearings, that such pollutant clearly is not a hazardous air pollutant. The Administrator shall establish any such standard at the level which in his judgment provides an ample margin of safety to protect the public health from such hazardous air pollutant.
 
 
 18
 42 U.S.C. Sec. 7412(b)(1)(B) (1982).
 
 
 19
 C. Regulatory Implementation of Section 112.
 
 
 20
 The pace of rulemaking under section 112 has been the subject of severe criticism by environmental groups. See generally Graham, The Failure of Agency-Forcing: The Regulation of Airborne Carcinogens under Section 112 of the Clean Air Act, 1985 Duke L.J. 100 (tracing the history of section 112 and recommending revisions). From 1970 to the enactment of the Clean Air Act Amendments of 1977, the EPA listed only five pollutants: asbestos (1971), beryllium (1971), mercury (1971), vinyl chloride (1975), and benzene (1977). See 40 C.F.R. Sec. 61.01 (1988). The House report on the 1977 amendments criticized the EPA for its preoccupation with criteria pollutants (regulated pursuant to Act Secs. 108-110) and the paucity of its activity in regulating hazardous air pollutants pursuant to section 112. See H.R.Rep. No. 294, 95th Cong., 1st Sess. 36 (1977), U.S.Code Cong. & Admin.News 1977, p. 1077.
 
 
 21
 The 1977 amendments included an "agency-forcing" provision which required the Administrator to decide whether to list arsenic, cadmium, and polycyclic organic matter within one year, and radioactive pollutants within two years, pursuant to Act Secs. 108, 111 and/or 112. See Act Sec. 122(a), 42 U.S.C. Sec. 7422(a) (1982). From 1977 to 1983, nonetheless, the Administrator added only radionuclides (1979) and inorganic arsenic (1980) to the List. In November, 1983, then Administrator Ruckelshaus conceded at a Congressional hearing that "delays in implementing Section 112 have been substantial and, to a large extent, avoidable." Hearing on EPA's Air Pollution Control Program before the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce, 98th Cong., 1st Sess. 31 (1983). The Administrator told the subcommittee: "we believe we can complete, by the end of 1985, decisions for approximately 20 to 25 substances on the list of 37" that the EPA had identified as possible candidates for the List. Id. at 39.
 
 
 22
 D. The Eight Pollutants.
 
 
 23
 Among the thirty-seven possible candidates for listing were seven of the eight Pollutants (all but 1,3-butadiene) at issue here, all of which were first identified by the EPA as possible candidates for listing as hazardous air pollutants in the late 1970's and early 1980's. Between June and October, 1985, the EPA published a series of Notices in the Federal Register relating to the eight Pollutants. See supra note 4. Each Notice is approximately four to five pages long and follows the same basic format. After a short summary of the contents of the document and description of uses of the chemical or metal, the Notices typically describe (a) the usual sources and amounts of the Pollutant emitted each year, (b) the extent of public exposure to the Pollutant, (c) the potential negative health effects based on exposure to any amount of the Pollutant by any method, and (d) the risk to public health from polluted ambient air; and include (e) a statement of the EPA's intent with regard to regulation of the Pollutant and (f) a description of the EPA rulemaking process and request for further information from the public.
 
 
 24
 EPA conclusions expressed in the Notices with respect to health effects and risks relied on findings contained in either a Health Assessment Document ("HAD") or Mutagenicity and Carcinogenicity Assessment Document ("MCAD"), both of which are reports issued by the EPA comprehensively evaluating the health effects of a particular pollutant. In each case, the HAD or MCAD was submitted to and reviewed by the EPA's Science Advisory Board for advice concerning the agency's health-related findings. In addition to summarizing the EPA's findings with regard to the Pollutants' toxicity and other health effects, the Notices contain the EPA's conclusions that seven of the eight Pollutants should be considered probable human carcinogens based on the evidence collected. With regard to the eighth Pollutant, hexavalent chromium, the EPA concluded that scientific evidence supported classifying that substance as a known human carcinogen.
 
 
 25
 In seven of the eight notices, the EPA said that it intended to add the relevant Pollutant to the List at some unspecified time in the future, but would make a final decision whether to act upon that intention only after making further studies of emission control techniques and health risks. Those notices used virtually identical language to explain the EPA's intentions. The Notice for cadmium is typical:
 
 
 26
 Based on the health and preliminary risk assessment described in today's notice, EPA now intends to add cadmium to the section 112(b)(1)(A) list. The EPA will decide whether to add cadmium to the list only after studying possible techniques that might be used to control emissions of cadmium compounds and after further improving the assessment of the public health risks. The EPA will add cadmium to the list if emission standards are warranted. The EPA will publish this decision in the Federal Register.
 
 
 27
 50 Fed.Reg. at 42003.
 
 
 28
 Acrylonitrile is the only pollutant for which the EPA varied from the above pattern. The Notice for acrylonitrile announced the beginning of a "pilot program" under which state and local agencies with jurisdiction over individual sources of acrylonitrile emissions would assess any health effects caused by atmospheric concentrations of acrylonitrile and determine whether regulatory controls were needed for specific sources. According to the EPA, a localized approach was justified "[b]ecause the estimated national aggregate cancer risks are relatively low (i.e., one cancer incidence every two years) and because [acrylonitrile] emissions appear to be localized and limited." 50 Fed.Reg. at 24320. Involving the states would allow "tailoring of individual regulations" and would "likely result in faster regulation of [arcylonitrile] sources," as well as "the conservation of EPA resources." Id.
 
 
 29
 E. The Proceedings Below.
 
 
 30
 On January 21, 1986, NRDC filed suit against the Administrator under section 304(a)(2) of the Act. NRDC's complaint asked the district court to declare that the Administrator had violated a nondiscretionary duty to add each of the Pollutants to the List, and to direct compliance by the Administrator within thirty days. NRDC contended that once the Administrator has determined that an air pollutant is likely to cause cancer in human beings, the Administrator is then obliged to list the pollutant pursuant to section 112. With specific regard to the eight Pollutants, NRDC argued that the Administrator's 1985 characterization of the Pollutants as "likely or known carcinogens" was the "functional equivalent" of a statutory finding that they were "hazardous air pollutants," and therefore required immediate listing.
 
 
 31
 NRDC moved for summary judgment, as did the Administrator and the Intervenors. The Administrator and the Intervenors also moved to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), contending that the Administrator had not yet made the statutory finding that any of the Pollutants was a hazardous air pollutant, and that even after making such a finding, he retains discretion whether to list a pollutant under section 112.
 
 
 32
 The district court granted the motion to dismiss, stating:
 
 
 33
 Interference with the Administrator's discretionary powers is particularly inappropriate in this case where, in order to determine whether the Administrator has found the subject pollutants to be the "functional equivalent" of hazardous air pollutants, I am called upon to judge the sufficiency of Agency decisions based on analyses of complex scientific data. Such decisions require "the fusion of technical knowledge and skills with judgment which is the hallmark of duties which are discretionary." Kennecott Copper Corp. v. Costle, 572 F.2d 1349, 1354 (9th Cir.1978).
 
 
 34
 * * *
 
 
 35
 * * *I hold only that the Administrator's interpretation of [section 112(a)(1), defining "hazardous air pollutant"] is not so unreasonable that this district court, constrained by Congress' grant of limited jurisdiction, should depart from the well settled rule that courts should show "great deference to the interpretation given the statute by the officers or agency charged with its administration."
 
 
 36
 NRDC v. Thomas, 689 F.Supp. 246, 255-56 (S.D.N.Y.1988).
 
 
 37
 This appeal followed.
 
 Discussion
 
 38
 The issue before this court is whether the district court had jurisdiction under the Act to hear this case. NRDC contends that in failing to list the Pollutants pursuant to Act Sec. 112, the Administrator has failed "to perform [an] act or duty ... which is not discretionary with the Administrator" within the meaning of Act Sec. 304(a)(2). We agree with the Administrator and the Intervenors, however, that this is not so.
 
 Congress enacted section 304:
 
 39
 in order to permit citizen enforcement of "clear-cut violations by polluters or defaults by the Administrator" where the only required judicial role would be to make a clear-cut factual determination of whether a violation did or did not occur. District courts are better suited to making factual determinations than are courts of appeal, and this no doubt is why Congress determined that district courts should have jurisdiction over this type of claim.
 
 
 40
 Sierra Club v. Thomas, 828 F.2d 783, 791 (D.C.Cir.1987) (quoting NRDC v. Train, 510 F.2d 692, 700 (D.C.Cir.1975)).
 
 
 41
 Consistent with the foregoing, "the nondiscretionary duty requirement imposed by Sec. 304 must be read in light of the Congressional intent to use this phrase to limit the number of citizen suits which could be brought against the Administrator and to lessen the disruption of the Act's complex administrative process." Kennecott Copper Corp. v. Costle, 572 F.2d 1349, 1353 (9th Cir.1978).
 
 
 42
 NRDC contends that this case nonetheless falls within the limited category amenable to district court jurisdiction under section 304 because the Administrator, in the Notices, "made positive determinations on all issues relevant to the definition of a 'hazardous air pollutant' under Section 112 of the Act." Specifically, NRDC stresses that the Pollutants are concededly "air pollutant[s] to which no ambient air quality standard is applicable" within the meaning of Act Sec. 112(a)(1). NRDC then contends that the conclusion in the Notices that each of the Pollutants is a known or probable carcinogen is the "functional equivalent" of a section 112(a)(1) determination that each Pollutant "in the judgment of the Administrator causes, or contributes to, air pollution which may reasonably be anticipated to result in an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness."
 
 
 43
 The district court declined to rule definitively whether NRDC's position is a correct interpretation of the definition of "hazardous air pollutant" in Act Sec. 112(a)(1), concluding that:
 
 
 44
 [F]or this court to attempt to define the scope of EPA powers made plainly discretionary on the face of the statute, merely because exercise of those powers might give rise to an enforceable non-discretionary duty, would be to exceed the jurisdiction granted the district courts. Such determinations are necessarily left to the Court of Appeals for the District of Columbia Circuit, the court to which Congress has assigned review of nationally applicable discretionary actions of the Administrator. Any other conclusion would create the risk of inconsistent judgments and resulting confusion that Congress sought to avoid by vesting exclusive jurisdiction in the D.C. Circuit. See Telecommunications Research and Action Center v. F.C.C., 750 F.2d 70, 78 (D.C.Cir.1984).
 
 
 45
 NRDC v. Thomas, 689 F.Supp. at 255.
 
 
 46
 NRDC contends that the district court's approach is excessively deferential to the District of Columbia Circuit. In any event, we conclude that, on the merits of the question, section 304(a)(2) jurisdiction does not lie in this case.
 
 
 47
 NRDC relies heavily on an earlier decision in this circuit, NRDC v. Train, 545 F.2d 320 (2d Cir.1976), where this court mandated listing of lead under Act Sec. 108(a)(1), 42 U.S.C. Sec. 7408(a)(1) (1982). In that case, however, the Administrator conceded that lead was an air pollutant "which, in his judgment, cause[d] or contribute[d] to air pollution which may reasonably be anticipated to endanger public health or welfare," Act Sec. 108(a)(1)(A), and that its "presence in the ambient air results from numerous or diverse mobile or stationary sources," Act Sec. 108(a)(1)(B), contending only that he need not list lead because he did not then "plan[ ] to issue air quality criteria under [section 108]" for lead, Act Sec. 108(a)(1)(C). We rejected that contention in view of the overall structure, policy and history of the Act. See 545 F.2d at 324.[6]
 
 
 48
 NRDC v. Train, however, does not control decision here. Rather, as the district court stated:
 
 
 49
 In the current controversy the EPA does not concede that the subject air pollutants meet the statute's definition of "hazardous." Quite the opposite is true. The agency resolutely maintains that it has made no final determination as to the degree of risk posed by each of the pollutants and specifically denies that it has found any of the pollutants to be hazardous air pollutants under the terms of the statute.
 
 NRDC v. Thomas, 689 F.Supp. at 254.[7]
 
 50
 We agree with this assessment. For the most part, the Notices indicate that more data is being compiled,[8] or that the available testing methodology is limited.[9] Moreover, these conclusions, as pointed out in the Notices, are based upon experiments on laboratory animals, see, e.g., 50 Fed.Reg. at 24318 (hexavalent chromium); 50 Fed.Reg. at 41466-67 (1,3-butadiene), or upon the epidemiological studies of workers exposed to unusually high levels of the Pollutants, see, e.g., 50 Fed.Reg. at 24318 (hexavalent chromium); 50 Fed.Reg. at 41996 (ethylene dichloride), leaving open to further investigation the overall effects of the Pollutants upon the general human population.
 
 
 51
 As for hexavalent chromium, the one pollutant identified by the EPA as a known carcinogen, the notice cautions that as with the other Pollutants, "further study is underway to identify additional source categories and to improve these emissions estimates." 50 Fed.Reg. at 40287. Indeed, the Notices uniformly make clear that the data on the sources and concentrations of the pollutants in the ambient air is not yet complete. See 50 Fed.Reg. at 24317 (hexavalent chromium); 50 Fed.Reg. at 24319 (acrylonitrile); 50 Fed.Reg. at 32624-25 (carbon tetrachloride); 50 Fed.Reg. at 39628 (chloroform); 50 Fed.Reg. at 40288 (ethylene oxide); 50 Fed.Reg. at 41467 (1,3-butadiene); 50 Fed.Reg. at 41997 (ethylene dichloride); 50 Fed.Reg. at 42002 (cadmium).
 
 
 52
 We conclude that the Notices are not, as NRDC contends, the "functional equivalent" of determinations by the Administrator that the Pollutants are "hazardous air pollutants," a term whose statutory definition in section 112(b)(1)(A) expressly incorporates the judgment of the Administrator as to health effects. In rendering this judgment, the Administrator must have the flexibility to analyze a great deal of information in an area which " 'is on the frontiers of scientific knowledge.' " NRDC v. U.S. Envtl. Protection Agency, 824 F.2d 1146, 1163 (D.C.Cir.1987) (en banc) (quoting Industrial Union Dep't, AFL-CIO v. Hodgson, 499 F.2d 467, 474 (D.C.Cir.1974)).
 
 
 53
 No different conclusion is required as to acrylonitrile because the Administrator has embarked upon a federal/state "pilot program" with respect to that Pollutant. This was done "[b]ecause the estimated national aggregate cancer risks [from acrylonitrile] are relatively low (i.e., one cancer incidence every two years) and because [acrylonitrile] emissions appear to be localized and limited." 50 Fed.Reg. at 24320. The EPA anticipated possible "future actions resulting from the evaluation of the [acrylonitrile-] emitting sources" in the course of the federal/state pilot program. Id. at 24321. Indeed, the entire program was designed "to further analyze certain [acrylonitrile] emitting sources to determine if additional controls are warranted." Id. at 24319.
 
 
 54
 We note, finally, NRDC's statement that it "alleges not unreasonable delay but the failure to perform mandatory duties." NRDC reply brief at 7 n. 7. We recently considered unreasonable delay by the Administrator in Environmental Defense Fund v. Thomas, 870 F.2d 892 (2d Cir.1989), where we held that district courts can exercise a limited jurisdiction under Act Sec. 304 in certain circumstances "to compel the Administrator to take some formal action, employing rulemaking procedures," id. at 900. We premised that ruling upon the observation that "the District of Columbia Circuit has distinguished between those revision provisions in the Act that include stated deadlines and those that do not, holding that revision provisions that do include stated deadlines should, as a rule, be construed as creating non-discretionary duties." 870 F.2d at 897 (citing Sierra Club v. Thomas, 828 F.2d 783, 791 (D.C.Cir.1987)).
 
 
 55
 Environmental Defense Fund, however, dealt with Act Sec. 109(d)(1), 42 U.S.C. Sec. 7409(d)(1) (1982), which requires the Administrator to undertake revisions of national ambient air quality standards "[n]ot later than December 31, 1980 and at five-year intervals thereafter." Section 112(b)(1)(A), by contrast, requires only that the Administrator "shall from time to time ... revise" the List. Accordingly, even if NRDC were claiming unreasonable delay, Environmental Defense Fund would not advance its cause. Nor, in any event, would that case authorize any action on our part to direct the substance, rather than the timing, of the Administrator's action, as NRDC here seeks. See 870 F.2d at 900 (district court does not have jurisdiction to order Administrator to make particular revision).
 
 
 56
 As our review earlier herein of the Administrator's regulatory action under section 112 should make clear, there are certainly grounds for impatience with the pace of that activity. There are, however, judicial remedies available in the District of Columbia Court of Appeals to address such delay where the limited rule of Environmental Defense Fund does not authorize any district court remedy. See Sierra Club v. Thomas, 828 F.2d 783, 792-97 (D.C.Cir.1987).
 
 
 57
 In any event, both district and circuit courts "have just so much jurisdiction as Congress has provided by statute." Id. at 792. As the district court correctly concluded in this case, its jurisdiction under section 304(a)(2) of the Act does not extend to the claim presented here by NRDC.Conclusion
 
 
 58
 The judgment of the district court is affirmed.
 
 
 
 [1]
 NRDC also alleged subject matter jurisdiction under 28 U.S.C. Secs. 1331 (1982) (federal question), 1337 (1982 & Supp. V 1987) (interstate commerce), and 1361 (1982) (mandamus). Jurisdictional claims under these provisions were rejected by the district court, and are not pressed on this appeal
 
 
 [2]
 42 U.S.C. Sec. 7604(a) (1982) provides in pertinent part:
 [A]ny person may commence a civil action on his own behalf--
 (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator....
 The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, ... to order the Administrator to perform such act or duty....
 
 
 [3]
 42 U.S.C. Sec. 7607(b)(1) (1982) provides in pertinent part:
 A petition for review of action of the Administrator in promulgating ... any emission standard or requirement under section 7412 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia.
 
 
 [4]
 The publications were as follows:
 Hexavalent chromium: 50 Fed.Reg. 24317 (June 10, 1985);
 Acrylonitrile: 50 Fed.Reg. 24319 (June 10, 1985);
 Carbon tetrachloride: 50 Fed.Reg. 32621 (Aug. 13, 1985);
 Chloroform: 50 Fed.Reg. 39626 (Sept. 27, 1985);
 Ethylene oxide: 50 Fed.Reg. 40286 (Oct. 2, 1985);
 1,3-Butadiene: 50 Fed.Reg. 41466 (Oct. 10, 1985);
 Ethylene dichloride: 50 Fed.Reg. 41994 (Oct. 16, 1985); and
 Cadmium: 50 Fed.Reg. 42000 (Oct. 16, 1985).
 
 
 [5]
 The Clean Air Act, originally enacted by the Act of July 14, 1955, ch. 360, 69 Stat. 322 (1955), was substantially amended and revised by the Clean Air Act Amendments of 1970, Pub.L. No. 91-604, 84 Stat. 1685 (formerly codified as amended at scattered sections of 42 U.S.C.), and then was completely revised by the Clean Air Act Amendments of 1977, Pub.L. No. 95-95, 91 Stat. 685 (1977) (current version at 42 U.S.C.A. Secs. 7401-7642 (West 1983 & Supp.1989))
 
 
 [6]
 The Administrator contends that because Act Sec. 112(b)(1)(A) requires him to list only "hazardous air pollutant[s] for which he plans to establish an emission standard under this section," and since he has no such present plan with respect to the Pollutants, we should decide this case in his favor even if we conclude that the Pollutants are indeed hazardous air pollutants within the meaning of section 112(a)(1). The Administrator contends in this regard that NRDC v. Train, which interpreted Act Sec. 108, should not be extended to cover Act Sec. 112, and that the district court's contrary determination, see 689 F.Supp. at 253-54, is erroneous. In view of our disposition of this appeal, we do not reach this issue
 
 
 [7]
 Maine v. Thomas, 874 F.2d 883 (1st Cir.1989), rules that EPA regulations which "amount[ ] to the Agency's promise to deal substantively with [a] matter in future rules and orders," id. at 885, constitute "final action" immediately reviewable in a circuit court of appeals pursuant to section 307(b)(1), 42 U.S.C. Sec. 7607(b)(1) (1982), precluding district court jurisdiction under section 304(a)(2), 42 U.S.C. Sec. 7604(a)(2). See Maine v. Thomas, 874 F.2d at 885-88. No party here contends that the Notices constitute such a "promise," so we have no occasion to consider the rule stated in Maine v. Thomas
 
 
 [8]
 The Notice for chloroform, which is typical of several of the Pollutants, states: "There are other inputs to the risk estimates which are very preliminary at the current stage of assessment and which will be substantially refined through further study." 50 Fed.Reg. at 39628
 
 
 [9]
 The Notice for ethylene oxide states: "[E]thylene oxide has not been measured in the ambient air. Reliable ambient air monitoring methodology for its measurement is not currently available." 50 Fed.Reg. at 40287